ALGEIER WOODRUFF, P.C.
60 Washington Street
Morristown, New Jersey 07960
(973) 539-3600
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KEITH HINTON,

        Plaintiff,

  vs.

CITY OF EAST ORANGE, EAST
ORANGE POLICE DEPARTMENT,
CHARLES GRIMES, individually
and in his capacity as Chief
of Police, LT. PAUL DAVIS,
individually and in his
capacity as an Officer in the
East Orange Police Department,
SHARON MOSEBY, individually
and din her capacity as an
Officer with the East Orange
Police Department, LUCAS
PHILLIPS, individually and in
his capacity as former counsel
for the City of East Orange,
MICHAEL PYCZKO, individually
and in his capacity as acting
Chief of Police, et al.,

        Defendants.

Civil Action No.: CV-04-4858
(PGS)

**Document Electronically Filed**

---

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS
### FOR SUMMARY JUDGMENT AND/OR TO DISMISS THE COMPLAINT

---

Kathryn J. Kingree, Esq.
On the Brief

Robert B. Woodruff, Esq.
Of Counsel and on the Brief

## *TABLE OF CONTENTS*

TABLE OF AUTHORITIES........................................... v

PRELIMINARY STATEMENT.......................................... 1

STATEMENT OF FACTS............................................. 2

PROCEDURAL HISTORY............................................ 15

RESPONSE TO DEFENDANTS CITY OF EAST ORANGE.................... 16

LEGAL ARGUMENT

    POINT I
    GENUINE ISSUES OF MATERIAL FACT
    EXIST IN THIS CASE AND DEFENDANTS'
    MOTIONS FOR SUMMARY JUDGMENT
    SHOULD PROPERLY BE DENIED.............................. 23

PLAINTIFF'S OPPOSITION TO DEFENDANTS' CITY OF EAST
ORANGE AND EAST ORANGE POLICE DEPARTMENT'S MOTION........... 26
    POINT II
    PLAINTIFF HAS ESTABLISHED COMPETENT
    EVIDENCE OF A "PAY TO PLAY" SCHEME
    TO WITHSTAND A MOTION FOR SUMMARY JUDGMENT............. 26

    POINT III
    PLAINTIFF'S CLAIMS ARE NOT BARRED
    ON THE GROUNDS OF THE DOCTRINE
    OF COLLATERAL ESTOPPEL................................ 30

    POINT IV
    PLAINTIFF HAS SET FORTH A VIABLE
    CAUSE OF ACTION FOR A CEPA VIOLATION.................. 32

    POINT V
    THE CITY OF EAST ORANGE AND THE
    EAST ORANGE POLICE DEPARTMENT
    ADOPTED THE WRONGFUL ACTS OF
    THE INDIVIDUAL DEFENDANTS AND
    THE MOTION TO DISMISS THE THIRD,
    FIFTH AND SIXTH COUNTS OF THE
    COMPLAINT MUST BE DENIED.............................. 38

POINT VI
PLAINTIFF HAS ESTABLISHED GENUINE
ISSUES OF MATERIAL FACT REGARDING
HIS FIRST AMENDMENT CLAIMS AND
SUMMARY JUDGMENT SHOULD BE DENIED...................... 56

POINT VII
PLAINTIFF HAS MADE A SUFFICIENT
SHOWING OF A DENIAL OF DUE PROCESS TO
WITHSTAND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT...... 59

POINT VIII
PLAINTIFF HAS MADE A SUFFICIENT
SHOWING OF AN ACTUAL INJURY TO
ESTABLISH A CLAIM FOR INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS....................... 62

POINT IX
PLAINTIFF HAS ESTABLISHED A VIABLE
CLAIM FOR DENIAL OF LEAVE OF ABSENCE
TO RUN FOR PUBLIC OFFICE............................... 68

POINT X
PLAINTIFF HAS PLEADED A VIABLE
CAUSE OF ACTION UNDER THE
LAW AGAINST DISCRIMINATION............................. 74

POINT XI
PLAINTIFF HAS ESTABLISHED SUFFICIENT
EVIDENCE TO CREATE AN ISSUE AS TO
WHETHER HE IS ENTITLED TO PUNITIVE DAMAGES............. 77

POINT XII
DEFENDANTS' CONTENTION THAT THEY
ARE ENTITLED TO ATTORNEY'S FEES
IS MERITLESS AND SHOULD BE DENIED...................... 78

RESPONSE TO DEFENDANT JEST'S MOTION.......................... 78

POINT XIII
THE "RULE OF THREE" DOES NOT GIVE
DEFENDANTS' UNFETTERED DISCRETION
IN MAKING PROMOTION DECISIONS.......................... 78

POINT XIV
GENUINE ISSUES OF MATERIAL FACT
EXIST AS TO DEFENDANT JEST'S ROLE
IN THE DENIAL OF PLAINTIFF'S PROMOTION................. 85

POINT XV

DEFENDANT JEST'S MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM
FOR INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS SHOULD BE DENIED............................. 87

POINT XVI
DEFENDANT JEST'S MOTION TO DISMISS
PLAINTIFF'S LAD CLAIM SHOULD BE DENIED................. 87

RESPONSE TO DEFENDANT LIEUTENANT MICHAEL PYCZKO'S MOTION
RESPONSE TO PYZCKO'S RULE 56.1 STATEMENT................... 88

POINT XVII
DEFENDANT PYCZKO DOES NOT HAVE
QUALIFIED IMMUNITY FROM LIABILITY....................... 90

CONCLUSION............................................... 96

## *CASES*

*Adickes v. S.H. Kress & Co.*, 398 *U.S.* 144, 167-68 (1970).... 39

*Adkins v. Bd. Of Ed. Of Magoffin County*, 982 *F. 2d* 952, 959 (6th Cir. 1993) .......................................... 46

*Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 251-53 (1986)................................................ 25

*Andrews v. City of Philadelphia*, 895 *F. 2d* 1469, 1481 (3d Cir. 1990) ................................................... 43

*Baldassare v. New Jersey,* 250 *F. 2d* 188, 195 (3d Cir. 2001). 57

*Beck v. City of Pittsburgh*, 89 *F. 3d* 966 (9th Cir. 1996) .... 49

*Becton v. Thomas*, 48 *F. Supp. 2d* 747 (W.D. Tenn. 1999)... 70,71

*Biggs v. Village of Dupo*, 892 *F. 2d* 1298, 1304 (7th Cir. 1990) .......................................... 64

*Blair v. City of Pomona*, 223 *F. 3d* 1074, 1080, 1081 (9th Cir. 2000) ........................................ 42,43

*Board of County Commissioners of Bryan County v. Brown*, 117 *S. Ct.* 1382 (1997....................................... 39

*Bolden v. Southeastern Pa. Transp. Auth.*, 21 *F. 3d* 29,... 65,66

*Bowman v. Block*, 940 *F. 2d* 1211 (9th Cir. 1991) ............ 41

*Brady v. Fort Bend County*, 145 *F. 3d* 691, 698 (5th Cir. 1998) .......................................... 49

*Brill v. Guardian Life Ins. Co. of America*, 142 *N.J.* 520 (1995)....................................... 23,25

*Britton v. Maloney*, 901 *F. Supp.* 444, 450 (D. Mass. 1995)... 42

*Broadrick v. Oklahoma*, 413 *U.S.* 601, 93 *S. Ct.* 2908 (1973).. 69

*Carey v. Piphus*, 435 *U.S.* 247, 98 *S. Ct.* 1042, 55 *L. Ed. 2d* 252 (1978)........................... 62,63,64,66

*Chalmers v. City of Los Angeles*, 762 *F. 2d* 753, 761 (9th Cir. 1985) .......................................... 64

*Chow v. Gates*, 27 *F. 3d* 1445 (9th Cir. 1994) ............... 46

*City of Canton v. Harris*, 489 *U.S.* 378..................... 47

*City of Newport v. Fact Concerts, Inc.,* 453 *U.S.* 247 (1981). 39

*Clements v. Fashing,* 457 *U.S.* 957, 971, 102
*S. Ct.* 2836, 73 *L. Ed. 2d* 508 (1982)...................... 71

*Cohen v. McAllister*, 688 *F. Supp.* 1040 (W. D. Pa. 1988...... 26

*Coleman v. Kaye*, 87 *F. 3d* 1491, 1499-1506 (3d Cir. 1996).... 47

*Conley v. Gibson*, 355 *U.S.* 41, 45-46,
78 *S. Ct.* 99, 2 *L. Ed. 2d* 80 (1957)........................ 25

*Cox Broadcasting Corp. v. Cohn*, 420 *U.S.* 469,
95 *S. Ct.* 1029, 43 *L. Ed. 2d* 328 (1975).................... 58

*DeCarlo v. Fry,* 141 *F. 3d* 57, 61-62 (2d Cir. 1998)......... 45

*Dzwovar v. McDevitt*, 177 *N.J.* 451 (2003)................... 82

*Eddy v. City of Miami*, 715 *F. Supp.* 1553, 1555
(S.D. Fla. 1989).......................................... 43

*Flinn v. Gordon*, 775 *F. 2d* 1551, 1554 (11th Cir. 1985)...... 71

*Fogarty v. Boles,* 121 *F.* 3d 886, 888 (3d Cir. 1997)........ 57

*Green v. Philadelphia Hous. Auth.*,
105 *F. 3d* 882, 887-88 (3d Cir.)........................... 57

*Harlow v. Fitzgerald,* 457 *U.S.* 800, 818 (1982)............. 94

*Imbler v. Pachtman*, 424 *U.S.* 409, 417,
96 *S. Ct.* 984, 988-89, 47 *L. Ed. 2d* 128 (1976.............. 62

*In re Certificate of Need Granted to the Harborage*,
300 *N.J. Super.* 363 (App. Div. 1997)...................... 60

*In re Hruska,* 375 *N.J. Super.* 202
(App. Div. 2005)................................... 79,80,81,82

*Keelan v. Bell Commun. Research*,
289 *N.J. Super.* 531 (App. Div.) 1996...................... 37

*Keenan v. City of Philadelphia*,
983 *F. 2d* 459, 468-69 (3d Cir). 1992...................... 47

*Kentucky v. Graham v. Graham*, 473 *U.S.* 159 (1985)........... 39

*Larsen v. Senate of the Commonwealth of Pennsylvania,*
154 *F. 3d* 82, 86 (3d Cir. 1998)......................... 94,95

*Lehman v. Toys 'R' Us, Inc.,*
132 *N.J.* 587, at 624-625 (1993)........................... 77

*Mancuso v. Taft*, 476 *F. 2d* 187, 193 (1st Cir. 1973 ......... 71

*Marable v. Walker*, 704 *F. 2d* 1219, 1220 (11th Cir. 1983 ..... 65

*Mark v. Borough of Hatboro*, 51 *F. 3d* 1137 (3d Cir. 1995..... 46

*Memphis Community School District v. Stachura*,
477 *U.S.* 299, 106 *S. Ct.* at 2543........................ 63,64

*Meyer v. Nebraska*, 262 *U.S.* 390, 43 *S. Ct.* 625, 67 *L. Ed.* 1042
   (1923) ................................................ 70,71

*Miller v. Lorain County Bd. of Elections*, 141 *F. 3d* 252 (6th Cir. 1998),
*cert. denied*, 525 *U.S.* 923, 119 *S. Ct.* 278, 142 *L. Ed. 2d* 230 (1998) ............ 70

*Monell v. Department of Social Services*, 436 *U.S.* 658 (1978)
   ........................................................ 39,41,47,51,52,54

*Monroe v. Pape*, 365 *U.S.* 167 (1961)........................ 39

*Nekolny v. Painter,* 653 *F. 2d* 1164, 1172-73 (7th Cir. 1981),
*cert. denied*, 455 *U.S.* 1021, 102 *S. Ct.* 1719, 72 *L. Ed. 2d* 139
   (1982) ................................................ 64

*Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101S. Ct. 27 48, 69 L.
Ed. 2d 616 (1981) ........................................ 53,55

*Oviatt v. Pearce*, 954 *F. 2d* 1470 (9th Cir. 1992 ............ 40

*Owen v. City of Independence,* 445 *U.S.* 622, 100 *S. Ct.* 1398,
63 *L. Ed. 2d* 673........................................ 53,55

Pembaur v. City of Cincinnati, 475 U.S. 469,
106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).... 47,50,52,53,54,55

*Pica v. Sarno*, 907 *F. Supp.* 795, 803 (D. N.J. 1995)........ 66

*Pickering v. Board of Education*, 391 *U.S.* 563, 568, 88 *S. Ct.*
   1731, 20 *L. Ed. 2d* 811 (1968)........................... 58

*Reed v. Town of Babylon*, 914 *F. Supp.* 843, 892
(E.D.N.Y. 1996)................................................... 71

*Regan v. City of New Brunswick*, 305 *N.J. Super.* 342
(App. Div. 1997)................................... 82,83,84,85

*Reynolds v. Borough of Avalon*, 799 *F. Sup.* 442, 447
(D.N.J. 1992).............................................. 43

*Rode v. Dellaciprete*, 845 *F. 2d* 1195 (3d Cir. 1988)......... 41

*San Filippo v. Bongiovanni*, 961 *F. 2d* 1125 (3d Cir. 1992),
  certiorari denied, 113 *S. Ct.* 305,
506 *U.S.* 908, 121 *L. Ed. 3d* 228............................ 61

*Sorlucco v. New York City Police Department,*
971 *F. 2d* 864, 871 (3d Cir. 1992........................... 43

*Spell v. McDaniel*, 824 *F. 2d* 1380, 1387 (4th Cir. 1987 ...... 41

*Spence v. Board of Educ. Of Christina Sch. Dist.,*
806 *F. 2d* 1198, 1201 (3d Cir. 1986)....................... 64,65

*St. Louis v. Praprotnick*, 485 *U.S.* 112, 127 (1988).......... 39

*State in Interest of D.G.W.*, 70 *N.J.* 488 (1976.............. 61

*Sturm v. Clark*, 835 *F. 2d* 1009, 1011 (3d Cir. 1987)......... 26

*Sunkett v. Misci, 183 F. Supp. 2d* 691 (D.N.J. 2002.......... 57

*Suppan v. Dadona*, 203 *F. 3d* 228, 237 (3d cir. 2000)........ 57

*Trigalet v. City of Tulsa*, 239 *F. 3d* 1150 (10th Cir. 2001) .. 46

*VandeZilver v. Rutgers*, 971 *F. Supp.* 925 (D.N.J. 1997.... 59,60

*Vann v. City of New York*, 72 *F. 3d* 1040, 1049
2d Cir. 1995)............................................. 49

*Villabos v. Fava*, 342 *N. J. Super.* 38 (App. Div. 2001)... 36,37

*Warner v. Orange County Dept. of Probation,*
115 *F. 3d* 1068, 1071 (2d Cir. 1996......................... 39

*Washington Nat. Ins. Co. v. Board of Review of NJ Unemployment
  Compensation Comm'n*, 1 *N.J.* 545 (1949................... 61

*Wheeler v. Nieves*, 762 *F. Supp*. 617, 624.....................31

*Williams v. Trans World Airlines, Inc*., 660 F. 2d 1267,
1272-73 (8th Cir. 1981 .......................................64

*Wilson v. Garcia*, 471 *U.S*. 261, 273 (1985)..................38

### *Statutes*

170 *N.J*. 210..................................................36

42 *U.S.C*. Section 1983........38,39,46,51,52,54,62,78,79,90,94

*Fed. R. Civ. P*. 12(b)(6).....................................25,26

Fourteenth Amendment. *U.S.C.A*. Const. Amend. 14.............69

*N.J.S.A*. 10:5-17.............................................81

*N.J.S.A*. 11A:6-14..........................................72,73

*N.J.S.A*. 34:19-1 *et seq*....................................32

*N.J.S.A*. 34:19-3............................................33

*N.J.S.A. Const*. 1947, Art. 7, Section 1, Paragraph 2........79

New Jersey Law Against Discrimination
*N.J.S.A*. 10:5-1 et seq).....................................74

## PRELIMINARY STATEMENT

Plaintiff Keith Hinton initiated this lawsuit against the defendants alleging violation of his Federal and State civil rights based on the defendants' wrongful failure to promote him to the rank of Lieutenant and wrongful retaliation against him for his support of a fellow police officer. This retaliatory conduct worsened after the filing of this action and plaintiff makes a claim for same.

Keith Hinton contends that he was denied the promotion to which he was objectively entitled because he did not pay certain individuals for the promotion, as was the practice within the East Orange Police Department at the time of the events giving rise to the cause of action.

Plaintiff contends that he was subjected to extreme harassment and the target of retaliatory practices on the part of the defendants because he spoke up in favor of a fellow police officer, Norman Price, who was at the relevant time the subject of an investigation by an Essex County Grand Jury.

The defendants have moved for summary judgment and/or to dismiss plaintiff's complaint, claiming that the facts of this matter are undisputed and do not support a cause of action against the defendants on a number of legal theories.

Mr. Hinton contends that there are substantial disputed issues of fact as to whether these defendants acted in violation

1

of his rights when they denied him the promotion to which he was entitled; when they retaliated against him for support of his fellow police officer and for filing his own action, causing such extreme harassment that plaintiff had no alternative but to leave his long-time position with the East Orange Police Department.

### STATEMENT OF FACTS

In late 2001, Keith Hinton was employed as a police officer with defendant East Orange Police Department. Officer Hinton held the rank of Sergeant at this time and took the appropriate steps necessary to seek a promotion to the rank of Lieutenant. At the time, the department planned to promote ten officers to the rank of Lieutenant. Plaintiff and another Sergeant, Harvey Rison, tied for the last available position. Prior to the time that the promotions were made, two of the individuals who were eligible for promotion to Lieutenant retired. The retirement of these officers left nine eligible officers to fill ten available Lieutenant positions. (See Exhibit 3; and T. Grimes, p. 40-48, Exhibit 14). During his deposition, Chief Grimes confirmed that there were sufficient spots available for Keith Hinton's promotion, and he did not know why plaintiff was not promoted. (T. Grimes, p. 39-40). The City of East Orange through counsel Lucas Phillips' correspondence of May 20, 2002 advised the New Jersey Department of Personnel that the "the other eligible was selected based upon the absence of any sustained disciplinary history. (See Exhibit 4). As it is now admitted the "other eligible" [Rison} did have

more sustainable charges. (T. Jest, p. 44-63, Exhibit 15; T. Rison, p. 16-18, Exhibit 16).

The personnel files of Harvey Rison and Keith Hinton were reviewed in order to break what at that time appeared to be a tie for the final Lieutenant promotion. Defendant Tony Jest reviewed Harvey Rison's file. He reported that Rison's file showed him as having no sustainable disciplinary charges. In fact, Rison actually had two sustainable disciplinary charges, but his file had been purged of these charges. (T. Rison, p. 16-18). Defendants do not dispute that the Rison file was purged. Harvey Rison reviewed Keith Hinton's file and reported that Hinton had one sustainable disciplinary charge [which was correct]. Keith Hinton was advised that he would not be promoted because Rison had the better record. (T. Hinton, p. 76, Exhibit 17).

Lt. Paul Davis was head of Internal Affairs at the time that the Rison file was submitted as "purged." He was responsible for the professional work product of the department. He testified at his deposition that he would have done an investigation into the matter, if he knew of the purging. (T. Davis, 7/21/06, p. 73). Despite the fact that everyone is aware of the purging of the Rison file at this time, no investigation has ever been done, evidencing a ratification of the conduct of these officers by the City of East Orange.

At the time that plaintiff sought the promotion to Lieutenant, he was advised by defendant Lt. Paul Davis that if he

3

wanted to receive his advancement, he had to "get with the plan." Although Davis did not directly use the words "pay" for the promotion, the import of his statement was clear to plaintiff. Mr. Hinton understood Lt. Davis to be indicating that merit was not going to be the determinative factor in the promotion decisions. He understood that if he wanted to be promoted to Lieutenant he was going to have to pay someone to secure the position.

Defendant Davis advised plaintiff that he had to "get on the right team" and talk to Harvey Rison if he wanted to get promoted. Keith Hinton, in fact, refused to make payments to anyone. Shortly thereafter, he received the word that everyone on the eligibility list, with the exception of him, was being promoted. Following the official announcement of the promotions, plaintiff spoke with Harvey Rison about his exclusion. Rison advised plaintiff that he was not promoted because he did not pay the proper City Officials. (T. Hinton II, p. 308-310).

Another police officer, Barry Jackson, testified that he was present outside Chief Grimes' office when there was a discussion between the Chief and Norman Price as to Norman's potential promotion to sergeant. Norman Price asked Chief Grimes when the appointments were expected to be made. (Statement Jackson, 6-2 to 6-21, Exhibit 13; T. Price, p. 34-36, Exhibit 19). The chief responded that Norman Price should talk to Stephen Lewis to see what could be done to move the list. Steven Lewis was a Police Officer in the Department. Jackson was asked what Price would have

4

to do or give to Stephen Lewis. He answered, "[T]he way Chief Charles Grimes had explained it, I believe, it was some type of monetary value. Some type of dollar value." The follow-up question asked, "[A]nd money would be paid and a promotion would hopefully be assured?" Jackson answered, "yes." *Id.* at 8-7 to 8-14.

Stephen Lewis was also deposed in this case. Lewis admitted that he collected money from various members of the Police Department. Lewis claimed, however, that he gave the money he collected to Chief Grimes for his legal defense fund. (T. Lewis, p. 9, Exhibit 20). He claimed he gave the money to defendant Davis. Davis testified that he never received any monies from Lewis (T. Davis, p. 84-85). Interestingly, Chief Grimes denies ever having had a legal defense fund. Grimes testified that no officers ever gave him any money and Stephen Lewis in particular never gave him any money. (T. Grimes, p. 10-14). Lewis claimed that a group of officers, including Davis, Rison, Hall and Muse in addition to Lewis, formed the fund. (T. Lewis, p. 10). Grimes denied ever receiving money from any of these officers for any reason. If there was no defense fund, then what is the explanation for Lewis taking money from these officers, if not to pass on for a promotion as claimed by Price, Jackson and Hinton.

Lt. Davis testified that notwithstanding Stephen Lewis's testimony, Lewis never gave him money to give to the Chief's legal defense fund. Davis testified that he knew of no reason that Lewis would take money from these police officers. (T. Davis, p. 84-85).

5

Keith Hinton then went to his supervisors to discuss the denial of his promotion. Defendant Grimes, the Chief of Police, and an undisputed policymaker for the City of East Orange told him that he was not promoted because he had more sustainable charges on his record than did Rison. This was false and Grimes was fully aware that what he was saying was not true.

In a separate conversation with Harvey Rison, Rison had told Hinton that the disciplinary charges had been removed from Rison's personnel file prior to the review of his file by the Board of Police Commissioners so Rison would be promoted over plaintiff (T. Rison, p. 54-57).

In November 2002, Lt. Frank Cocchi who was also on the eligibility list announced that was going to retire six months early, thus opening another promotion position for plaintiff. Chief Grimes advised Cocchi that his retirement would not benefit Keith Hinton because he was not going to be promoted. (T. Hinton, p. 82). Shortly thereafter, Corporate Counsel Lucas Phillips informed the Board of Police Commissioners that they were not promoting anyone at that time. One month later, they promoted five Lieutenants. Keith Hinton was not one of them. Hinton was the only officer on the eligibility list who was not promoted. (T. Hinton, 22-4 to 22-6).

In or about 2003, Hinton began working with Matthew Goritski. (*Id.* at 33-12 to 33-14). During a conversation with Matthew

6

Goritski, Goritski told Hinton that he was asked to pay by Chief Grimes. (*Id.* at 58-21 to 58-24).

Throughout the years that plaintiff was employed by the East Orange Police Department and since at least late 2001, East Orange officials including members of the City Council and members of the Police Commission were aware that East Orange police officers were complaining that they could not advance in their careers unless they paid money for promotions. (T. Grimes, p. 50-51). At no time, however, did the City of East Orange initiate investigations into such claims to determine whether such illegal practices were ongoing. When plaintiff reported that Harvey Rison's file had been purged of the disciplinary charges during the promotion evaluation, the City of East Orange made no investigation into the circumstances of the purging of the file.

Harvey Rison testified that no one from the City of East Orange or the East Orange Police Department ever questioned him regarding the purging of the disciplinary charges from his file. (T. Rison, 9/18/06, p. 31).

The failure to investigate any of these complaints is indicative of the fact that the City of East Orange accepted such practices as status quo and adopted this illegal conduct as the policy of the City of East Orange. This policy encouraged members of the East Orange Police Department to continue demanding payment of monies to East Orange officials and/or members of the East

Orange Police Department as a condition of advancement within the Department.

Sometime later, in early 2004, Officer Norman Price was suspended from the East Orange Police Department as a result of having been indicted by the Essex County Prosecutor's Office. It was well known within the Department that Keith Hinton was a friend of Norman Price's and that he was supporting him. Norman Price had prepared a written document known as the "ATL Brief" (See Exhibit 1 and T. Price, p. 73) that was highly critical of defendant Davis, accusing him of having taken part in improper or illegal activities. The document was circulated among members of the police department. Defendant Davis was greatly disturbed by the statements made by Norman Price and their dissemination among the members of the Department. Davis testified that he was aware of the ATL Brief and its allegations against him. (T. Davis, p. 86-87). The ATL Brief fueled Davis's hostility toward Price and those supporting him, including Keith Hinton. In addition to the ATL Brief, Norman Price had previously filed an assault charge against Davis, a charge that greatly angered Davis. (T. Price, p. 210-214).

Sometime during the Spring of 2004, plaintiff was called into Internal Affairs where he and defendant Jest were present along with defendant Davis. Plaintiff's Union Representative was also present during this meeting. Keith Hinton was confronted as to his knowledge of the document widely understood to have been written

by Price. Davis advised Hinton during this meeting that he had the authority to grant him immunity as regards any information he could provide regarding Price. (T. Hinton, p. 88-89). Plaintiff had no knowledge of any criminal activities and did not understand what type of information Davis was seeking. It appeared that Davis was trying to get information relating to Norman Price and was angry that plaintiff would not help him with his prosecution of Price. Davis and Jest attempted to intimidate plaintiff with threats of prosecution. (T. Hinton, p. 51-52, 201-207, 408-409).

During this same meeting, Davis raised the subject of the purging of Harvey Rison's file during the promotion evaluation some years before. Davis was aware that it was being claimed that he was the individual responsible for purging the file. (See ATL Brief, Exhibit 1). In addition as noted in the sworn statement of former East Orange Police Officer, William Garvin it was not unusual for Davis to remove documents from a personnel file. (See Exhibit 23).  Davis asked plaintiff how he got the complete file and plaintiff advised that he had utilized the services of an investigator who located copies in Trenton. Plaintiff was required to give Davis a written statement about same, but was denied a copy of his statement. To this day Plaintiff has never received a copy of this statement.

Immediately thereafter, Davis called Plaintiff into his own office and began to rant about Norman Price. He stated that Price would not be in the position he was in if he would have given

Davis some money. (T. K. Hinton, 6/16/05, 395-25 to 396-17). During their conversation, Davis made it clear to Keith Hinton that he should avoid an association with Norman Price or face consequences both on the job and through possible criminal prosecution.

In May 2004, defendant Davis confronted plaintiff in the office and demanded that he cooperate in the prosecution of Norman Price. Davis warned plaintiff that if he did not tell him what he wanted him to say, that he would take him down to the Prosecutor's Office, strap him to a chair, and make him tell him what he wanted to hear.

Prior to his speaking out about the improper practices of the police department, Keith Hinton had been employed as a police officer with the Department for almost 18 years. During this lengthy career, there were never any sudden changes made to his assignments and/or duties. After he spoke up in opposition to the illegal practices of the Department in demanding money for promotions, and in opposition to what he believed to be wrongful prosecution of Norman Price, plaintiff's duties began to be altered dramatically.

Plaintiff was assigned to Day Patrol, a reassignment perceived as a demotion and intended to intimidate plaintiff. This also impacted his opportunities to supplement his income with outside employment. (T. Hinton, p. 282-284).

10

In September 2004, Norman Price filed an action against the City of East Orange and some of the defendants named in this action as well. After Price's complaint was filed, Davis commenced a pattern of retaliation towards plaintiff on the job with the Department and as to his secondary employment as well. Plaintiff was advised by Lt. Davis on September 4, 2004 that he could no longer work part-time. This rule only applied to plaintiff and no other police officer. Having to give up his secondary employment caused plaintiff serious financial losses. *Id.*

Plaintiff was assigned to the Dispatch Room (T. Hinton, p. 33) under the supervision of Deputy Chief Antonovich who was told, through written directive from Chief Grimes [which has not been produced but has been admitted to by Grimes], to be aware of plaintiff's whereabouts all day, everyday, and to submit a written report to the Chief regarding plaintiff's activities. The day plaintiff was assigned to the unit he was called into Deputy Chief Antonovich's office where Antonovich read him a written directive from Chief Grimes stating that he was to monitor Sergeant Hinton's activity and to report to
Grimes on a daily basis about Hinton's activities. (T. Hinton, 6/15/05, 116-25 to 117-14: see also Hinton Certification Exhibit 5, T. Grimes, p. 70).

Chief Grimes subsequently tried to explain this directive by testifying that he had received a tip regarding Keith Hinton not being at his post as he was supposed to be. (T. Grimes, p. 73-76).

11

Lt. Paul Davis, however, testified that Chief Grimes never informed him of this alleged "tip," thus casting doubt on the credibility of Grimes' explanation for this harassment of Keith Hinton. (T. Davis, p. 101). Grimes did nothing to confirm this "tip". There exists no documentation referring to this "tip" or any referencing to any investigation of same, nor did Grimes inquire of Hinton's supervisor, Antonovich, whether he was in fact shirking hiss duties. (T. Grimes, p. 76).

After Antonovich retired, Defendant Michael Pyczko became Hinton's supervisor and the harassment intensified. (T. Hinton, p. 116-9 to 123-25). Pyczko continued the pattern of harassment with the intent to stifle plaintiff's First Amendment Rights of Free Speech and Association. Pyczko's harassment was done under the supervision and/or instruction and authorization of Acting Chief of Police Cleary.

Exhibit 4 to the Brief of defendant Pyczko in support of his motion to dismiss the complaint shows the level of harassment. For example, a "to/from" to Sgt. Hinton from Lt. Pyczko asks Hinton to submit a report as to why he did not complete reports left for him. In Hinton's response to Pyzcko's memo, he indicates that the reports were not even properly directed to his attention, but left at another location where Hinton would have been unlikely to find them. In addition, Pyczko had scheduled him for training on the day the reports were purportedly due. A June 16, 2005 memo from Lt. Pyczko to Sgt. Hinton asks "were downstairs were you with a

citizen? (sic) "What citizen?" "Submit the report by June 17, 2005."{see also Hinton Cert. Exhibit 5).

A June 14, 2005 "to/from" to Hinton from Pyczko demands, "On June 3, 2005 you were not in communication to the end of your tour. Who authorized your time? What time did you leave communication? Submit a report by June 16, 2005, 0700 hour." Hinton responded the following day: "The undersigned did not leave HQ on 6-3-05 until 0700 hrs. The undersigned was downstairs talking to a citizen. The undersigned did not note what exact time I stepped out of communications. The undersigned notified all personnel that I would be out of the room." (Exhibit 8).

After his transfer to the Dispatch Room, plaintiff was given no training as to how to perform his duties. Defendants were clearly trying to ensure that plaintiff failed to perform his duties properly.  (Hinton Cert. Exhibit 5). Grimes agreed that it was important for the supervisor of communications to have been 911 trained and certified. (T. Grimes 76) In reality, he was being set up to fail and he was concerned. (Hinton Cert. Exhibit 5).

Hinton addressed his concerns over the lack of training to Lt. Pyczko on numerous occasions. On April 1, 2005, for example, Hinton repeated a request for training to Pyczko. "The sworn personel (sic) has no training in dispatch which has been reported on by the undersigned several times prior. The undersigned also has not been trained in Infocop." On April 27, 2005, Sgt. Hinton wrote to Lt. Pyczko once again about the training. "It is clear to

13

see that Officer Johnson has been assigned to dispatch without any prior training. The undersigned attempted to get training for the 2300-0700 dispatchers including the undersigned." (Exhibit 7).

As a result of the retaliatory actions taken by the defendants, Keith Hinton was forced to submit for an early resignation from his position as a police officer with the East Orange Police Department. Plaintiff could not continue to work in such an environment and in effect was constructively terminated from his position. As a result of the constructive termination, plaintiff lost the financial benefits of his continued employment with the Department, including advancement, raises and pension monies and other benefits which he otherwise would have received if allowed to remain on the job.

Prior to leaving the Department, plaintiff requested a leave of absence without pay in order to seek elective office in the City of East Orange. (Exhibit 11). Despite frequent attempts on the part of Mr. Hinton for a decision on his request (Exhibits 10 and 12) the request was improperly not approved by representatives of the City of East Orange and the police department. In his 20 years with the Police Department, plaintiff was not aware of any other officers being denied this opportunity. (Plaintiff's Responses to Grieco, Oates & DeFilippo interrogatories, #19, Exhibit).

Ironically, during the same Mayoral election in which plaintiff sought to run, another police officer, Detective Fred

14

Townes, also sought to run as a mayoral candidate against the sitting mayor. (T. Townes 17-25) Detective Townes' request for a leave of absence was ignored until his attorney sent a letter to the City of East Orange Corporation Counsel, Jason Holt, on his behalf. The attorney, Patrick Toscano, reminded Mr. Holt that the law on the subject was quite clear. (Exhibit 9). Detective Townes' request for a leave of absence was approved after his attorney's letter was sent.

## PROCEDURAL HISTORY

Plaintiff Keith Hinton initiated this lawsuit by filing a Complaint (Ex. A to Ferentz certification), which was subsequently amended on November 4, 2004 (Ex. B to Ferentz certification), May 16, 2005 (Ex. C to Ferentz certification) and August 16, 2005, the operative Third Amended Complaint (Ex. D to Ferentz certification).

Defendants filed Answers to the Third Amended Complaint.

Voluntary Stipulations of Dismissal were filed by plaintiff as to defendants Lucas Phillips on September 9, 2005 (Ex. F to Ferentz certification) and Sharon Moseby on July 17, 2006 (Ex. G to Ferentz Certification).

Defendants City of East Orange, East Orange Police Department and Michael Pyczko have filed motions for summary judgment. Plaintiff contends that there are numerous disputed material facts at issue in this matter and defendants' motions should properly be denied.

15

## RESPONSE TO DEFENDANTS CITY OF EAST ORANGE AND EAST ORANGE POLICE DEPARTMENT'S <u>STATEMENT OF MATERIAL FACTS.</u>

Defendants' statement of material facts are not set forth in numbered paragraphs, so plaintiff's response is to each paragraph as it appears in sequence.

Plaintiff does not dispute the characterization of the deposition excerpt at issue in the first paragraph.

Plaintiff disputes the statement in the second paragraph. At the time that the plaintiff sought the promotion to Lieutenant, he was advised by defendant Lt. Paul Davis that if he wanted to receive his advancement, he had to "get with the plan." Although Davis did not directly use the word "pay" for the promotion, the import of his statement was clear to Mr. Hinton. Plaintiff understood Davis to be indicating that merit was not going to be the determinative factor in the promotion decisions. He understood that if he wanted to be promoted to Lieutenant he was going to have to pay someone to secure the position.  Defendant Davis advised plaintiff that he had to "get on the right team" and talk to Harvey Rison if he wanted to get promoted. Plaintiff refused to pay for the promotion. Shortly after the promotions were officially announced and plaintiff was not among those promoted, he spoke with Harvey Rison. Rison told plaintiff he was not promoted because he did not pay the proper City Officials. (T. Hinton II, p. 308-310).

16

Plaintiff disputes the statements in paragraph 3. In late 2001, Keith Hinton took the steps to seek a promotion to the rank of Lieutenant. At the time, the department planned to promote ten officers to the rank of Lieutenant. (Exhibit 3). Plaintiff and Harvey Rison tied for the last available position. Prior to the time that the promotions were made, two of the other eligible individuals ahead of Rison and Hinton, retired. The retirement of these officers left nine eligible officers to fill ten available Lt. Positions. Chief Grimes confirmed that there were sufficient spots available for Keith Hinton's promotion. (T. Grimes, p. 39-40). The official statement of the City of East Orange as to why plaintiff was not promoted was that Rison was selected over plaintiff because of the absence of a disciplinary history. (See Lucas Phillips letters, Exhibit 4, 6). The personnel files of Harvey Rison and plaintiff were reviewed in order to break what appeared to be a tie at the time. Rison's file purportedly showed him as having no sustainable disciplinary charges. In fact, he had two such charges but his file had been purged. The issue of why Rison's file was purged of these charges and how it came to be purged has never been in any way investigated by the City of East Orange or the East Orange Police Department. They have ratified such conduct.

Plaintiff does not dispute that the documents referenced in paragraph 4 contain the statements set forth in the paragraph. However, plaintiff does dispute that the issue of the unfairness

of the denial of his promotion and the actual reason for the denial, rather than the pretextual reason, was ever litigated or considered in the appeal process to the Department of Personnel and/or the Merit System Board.

Plaintiff disputes the statement in paragraph 5. Plaintiff contends that there were actually enough available positions to promote both plaintiff and Harvey Rison to Lieutenant. Chief Grimes confirmed the availability of these positions in his deposition testimony and indicated that he did not know why plaintiff was not promoted. (T. Grimes, p. 39-40). Plaintiff disputes that the operation of the "rule of three" gave the defendants the right to make promotion decisions on the basis of anything other than merit or fitness for the position.

Plaintiff does not dispute that the document referenced in paragraph 6 contains the statement set forth in the paragraph. Plaintiff does dispute that the Merit System Board litigated the issue of the constitutional violations that occurred with respect to plaintiff's application for promotion to Lieutenant.

Plaintiff disputes the statement in paragraph 7. At the time that plaintiff sought the promotion, he was advised by Lt. Davis that if he wanted to receive his advancement, he had to "get with the plan." Although Davis did not directly use the words "pay" for the promotion, the import of his statement was clear to plaintiff. Hinton understood that merit was not going to be the determinative factor and if he wanted to be promoted he was going to have to pay

someone. (Compl.) Davis also advised plaintiff that he had to "get on the right team" and talk to Harvey Rison if he wanted the promotion. Plaintiff did not make any attempts to pay anyone for the promotion.  After the announcements for the promotions was made and plaintiff was not among those promoted, plaintiff did speak to Harvey Rison. Rison advised that plaintiff was not promoted because he did not pay the appropriate City officials. Another police officer, Barry Jackson, testified in a sworn statement that he was present outside Chief Grimes' office when there was a discussion between the Chief and Norman Price as to Price's potential promotion. Price asked Chief Grimes when the appointments were expected to be made. (S. Jackson, 6-2 to 6-21). The chief responded that Price should talk to Stephen Lewis to see what could be done "to move the list." Stephen Lewis was a police officer in the Department. Chief Grimes explained that some type of monetary value would be required. (*Id*. at 8-7 to 8-14; see also Price testimony previously referenced).

Stephen Lewis admitted collecting money from various members of the department. He claimed that he was collecting money for Chief Grimes' Legal Defense Fund. (T. Lewis, p. 9). Lewis claimed that he gave the money to defendant Davis. (T. Lewis, p. 12). Davis, however, denied ever receiving monies from Lewis. (T. Davis, p. 84-85). Chief Grimes denies ever having had a legal defense fund. Grimes testified that no officers ever gave him any

money and Stephen Lewis in particular never gave him any money.
(T. Grimes, p. 10-14).

A finder of fact could easily determine that this entire process
was evidence of "pay to play."

Plaintiff disputes the statements in paragraph 8 for the
reasons stated in the response to paragraph 8 above.

Plaintiff does not dispute the statements in paragraph 9.

Plaintiff disputes the statements in paragraph 10. Although
plaintiff does not dispute that the final decisions on promotions
were made by the police commissioners, it is his understanding
that Chief Grimes played an integral role in the selection of the
officers who would ultimately be promoted.

With respect to paragraph 11, plaintiff does not dispute that
one of the reasons for the denial of the promotion was his failure
to make payments to the appropriate persons. Plaintiff does not
dispute that the official statement of the reason for his
promotion denial was the fact that he had more sustainable
[disciplinary] charges than Harvey Rison, who was promoted.
Plaintiff adds that Harvey Rison in fact had more disciplinary
charges than plaintiff, but his file was purged of these charges
at the time that Rison's file and plaintiff's personnel files were
reviewed. Defendants do not deny that Rison's file was purged.

Plaintiff disputes the statement in paragraph 12. Plaintiff
has established that he suffered an actual injury in the form of

20

emotional distress as a result of the defendants' violation of his constitutional rights.

Plaintiff does not dispute the statement in paragraph 13 that he believes he suffered retaliation from the defendants as a result of his suggesting that proper procedures should be followed with respect to the Union providing an attorney for fellow officer Norman Price, who was the target of a criminal investigation at that time, and generally supporting Price. Price had serious differences at that time with members of the Department, including Lt. Davis. The defendants in seeking to indict Price, wrongfully intimidated and threatened supporters and/or friends of Price, in their effort to prosecute Price. With respect to the specific details of the indictment against Price, plaintiff asserts that the document speaks for itself.

Plaintiff disputes the statement in paragraph 14. The reassignment to Day Patrol was perceived as a demotion. The defendants were aware that the reassignment would prevent Mr. Hinton from pursuing his secondary employment and cost him a significant portion of his annual income. Other officers were permitted to hold secondary jobs to supplement their income. Plaintiff was harassed by the defendants in his new position. He was not given any training, thereby setting him up to fail.  Chief Grimes, based upon an "anonymous tip", issued a written directive requiring plaintiff's supervisors to make detailed reports of plaintiff's activities on a daily basis. The Chief could name no

other individual whom he had ever personally required to undergo
such scrutiny on a "tip."

Plaintiff disputes the statements in Paragraph 15. Plaintiff
does not dispute that the Third Amended Complaint alleges that
defendants Grimes, Davis and Jest conspired to intimidate him by
threatening unfounded criminal prosecution. Plaintiff disputes
that there is no credible proof of this claim as to Grimes or
Jest. Jest was present during the meeting at Internal Affairs with
Jest, Davis and another individual, during which plaintiff was
threatened with criminal prosecution. Jest does not deny that he
was present during this meeting nor that these threats were made.
(Jest Brief, p. 9). Jest argues only that he stood "mute, mum, did
not say anything." (Jest Brief, p. 9, citing T. Hinton, 203-7 to
203-21; 204-13 to 204-16). Jest is a police officer. Plaintiff
contends that Jest cannot escape liability simply by watching an
illegal act occur in his presence and saying or doing nothing to
stop it or remedy the illegality. With respect to Grimes, he was
the Chief of Police and at all times either or constructively
aware of the actions of the officers he supervised in the
department.

Plaintiff disputes the statements in Paragraph 16. After
Defendant Pyczko became plaintiff's supervisor, the harassment
intensified. (T. Hinton, 6/15/05 at 116-9 to 117-25). For example,
a "to/from" to Sgt. Hinton from Lt. Pyczko asks Hinton to submit a
report as to why he did not complete reports left for him. In

22

Hinton's response, he indicates that the reports were not even properly directed to his attention, but left at another location where Hinton would have been unlikely to find them. In addition, Pyczko had scheduled Hinton for training on the day and at the time that the reports were purportedly due. Further, a June 16, 2005 memo from Lt. Pyczko to Sgt. Hinton asks "were downstairs were you (sic) with a citizen? What citizen?" "Submit the report by June 17, 2005." (See also Hinton Cert. Ref. Above). Such trifling actions are a small sample of the harassment which was conferred. (T. Hinton, p. 118-122).

Plaintiff disputes the statements in paragraph 17. Plaintiff was forced out of his position by continued harassment at work on the part of the defendants. He was constructively terminated from his position.

## LEGAL ARGUMENT

### POINT I

#### GENUINE ISSUES OF MATERIAL FACT EXIST IN THIS CASE AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT SHOULD PROPERLY BE DENIED.

In *Brill v. Guardian Life Ins. Co. of America*, 142 *N.J.* 520 (1995) our Supreme Court has directed that the decision be made as follows:

> The determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in

23

consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the allegedly disputed issue in favor of the non-moving party.  This assessment of the evidence is to be conducted in the same manner as that required under *R.* 4:37-2(b) [i.e., involuntary dismissal at trial].

The role of the judge in the summary judgment procedure is to determine whether there is a genuine issue as to a material fact, but not to decide the issue as to a material fact, but not to decide the issue if he finds it to exist. *Id.* at 73. The defendants have not established the absence of any genuine issues of material disputed fact in this case and the motions for summary judgment should be denied.

Defendants contend that their motions for summary judgment should be granted because the plaintiff cannot establish as a matter of direct evidence that anyone ever stated to him in precise words, "if you want to be promoted, you have to pay." Defendants also argue that plaintiff has not been able to convince any other police officer to risk his position and career by stating directly that they were asked to pay for a promotion or to keep a benefit of their employment.

In order to withstand a motion for summary judgment, plaintiff is obligated to establish only the existence of a genuine issue of material fact, not to prove his entire case. The existence of a genuine issue of material fact can be established both by circumstantial and direct evidence. In this case,

24

allegations of conspiracy to engage in wrongdoing on the part of public officials, it would be highly unlikely that plaintiff could prove his case by direct evidence. The fact that the defendants may not have been completely obvious or overt about their requests for payment does not end the analysis. The defendants, as would be expected, communicated their requests for payment in more ambiguous terms, which were clearly understood by the recipients of those cryptic messages.

*Brill, supra,* adopts the federal standard for deciding motions for summary judgment, requiring the court to engage in essentially the same analytical process as that necessary to rule on a motion for a directed verdict.  This evaluation is not the same kind of weighing that a factfinder engages in when assessing the preponderance or credibility of evidence.  In deciding a summary judgment motion, the court must assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id*. at 536 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 251-53 (1986)).  In its analysis under *Brill*, this Court must still grant all favorable inferences to the party opposing the motion.

A motion to dismiss, pursuant to *Fed. R. Civ. P.* 12(b)(6), tests the legal sufficiency of the complaint. *Conley v. Gibson,* 355 *U.S.* 41, 45-46, 78 *S. Ct.* 99, 2 *L. Ed. 2d* 80 (1957). Accordingly, an action will be dismissed under 12(b)(6) only when

the plaintiff has failed to state a claim upon which relief can be granted. The criteria for deciding whether a plaintiff has met this standard have been clearly established. "In reviewing a motion to dismiss a complaint for failure to state a claim upon *Fed. R. Civ. P.* 12(b)(6), all allegation s in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm v. Clark*, 835 *F. 2d* 1009, 1011 (3d Cir. 1987). A motion made pursuant to *Fed .R. Civ. P.* 12(b)(6) shall be treated as a motion for summary judgment where, as here, the moving party attaches matters outside the pleadings. *See Cohen v. McAllister*, 688 *F. Supp.* 1040 (W. D. Pa. 1988).

As set forth in detail in plaintiff's response to defendants' statement of undisputed facts, genuine issues of material fact exist in this case as to plaintiff's claims of wrongdoing against these defendants and the motions for summary judgment should be denied.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' CITY OF EAST ORANGE AND EAST ORANGE POLICE DEPARTMENT'S MOTION**

## POINT II

### PLAINTIFF HAS ESTABLISHED COMPETENT EVIDENCE OF A "PAY TO PLAY" SCHEME TO WITHSTAND A MOTION FOR SUMMARY JUDGMENT.

Defendants argue that plaintiff's allegations that the fact that he was not promoted to Lieutenant was based, at least in part, on his refusal to participate in the Department's "pay to

play" scheme is not supported of competent evidence. Plaintiff has in fact provided substantial circumstantial evidence to support this contention and the motion for summary judgment on this basis should be denied.

Mr. Hinton has established that at the time that he sought the promotion to Lieutenant, there were ten spots available for all eligible persons on the list to be promoted. (Exhibit 3—Certification of Eligibles for Appointment). After plaintiff was appointed to the eligible list, two of the other individuals who were eligible for promotion retired. The retirement of these officers left nine eligible officers to fill ten available Lieutenant positions. During his deposition, Chief Grimes confirmed that there were sufficient spots available for plaintiff's promotion and he stated that he did not know why Hinton was not promoted. (T. Grimes, p. 39-40).

The pretextual reason for the failure to promote plaintiff was that he had tied for the last available spot with Harvey Rison. The Department claimed that the personnel files of Rison and plaintiff were reviewed in an attempt to "break the tie." Defendant Jest reviewed Rison's file. He reported that Rison had no sustainable disciplinary charges. (T. Jest, p. 49-65). In fact, Rison actually had two sustainable disciplinary charges, one more than plaintiff. His file had been purged of these charges. Defendants do not dispute that the Rison file was purged. Rison himself testified that he had two sustainable charges.

At the time that plaintiff sought this promotion, he was advised by defendant Davis that if he wanted to be promoted, he had "to get with the plan." Although Davis did not directly use the words "pay" for the promotion, the import of his statement was clear to Mr. Hinton. Hinton understood Davis to be telling him that if he wanted to be promoted, he would have to pay someone.

Davis advised plaintiff that he had to "get on the right team" and talk to Harvey Rison if he wanted to be promoted. Plaintiff did not make payments to anyone. Shortly thereafter, he received word that everyone on the eligibility list, with the exception of him, was being promoted. After the announcements, plaintiff spoke with Harvey Rison about his exclusion. Rison advised plaintiff that he was not promoted because he did not pay the proper City officials.

Barry Jackson, another police officer, testified that he was present outside Grimes' office when there was a discussion between Chief Grimes and Norman Price about Price's promotion to Sergeant. Price asked Chief grimes when the appointments were expected to be made. (S. Jackson, 6-2 to 6-21). The Chief told Price to talk to Stephen Lewis to see what could be done "to move the list." Price also testified to the event. Stephen Lewis was another Police Officer in the department. Jackson indicated in his statement what he understood from that exchange was that Price would have to do or give Stephen Lewis to get the promotion. Jackson answered, "[T]he way Chief Charles Grimes had explained it, I believe, it

was some type of monetary value. Some type of dollar value." The follow-up question was asked, "[A]nd money would be paid and a promotion would hopefully be assured?" Jackson answered, "yes." *Id.* at 8-7 to 8-14.

Stephen Lewis admitted that he collected money from various members of the Police Department. Lewis claimed that he gave the money he collected to Chief Grimes for his Legal Defense Fund. (T. Lewis, p. 9). Lewis claimed that he actually turned the money over to defendant Davis. Davis, however, denied ever receiving any monies from Lewis. Davis testified that he had no idea why Stephen Lewis would be taking money from these police officers. Chief Grimes denied ever having had a Legal Defense Fund. Grimes testified that no officers ever gave him any money, including Stephen Lewis. (T. Grimes, p. 10-14).

Lewis claimed that a group of officers, including himself, Davis, Rison, Hall and Muse, formed the Legal Defense Fund. (T. Lewis, p. 10). Grimes denied ever receiving money from any of these officers for any reason. If there was no defense fund, what is the explanation for Lewis taking money from these officers? The only plausible explanation for Lewis taking money from these officers was to pass it on for promotions, consistent with what Price, Jackson and Hinton claim.

In or about 2003, Keith Hinton began working with another officer, Matthew Goritski. (T. Hinton, 33-12 to 33-14). During a conversation with Goritski, Hinton was told that Goritski had been

29

asked to pay for promotion by Chief Grimes. *Id.* at 58-21 to 58-24).

Norman Price was subsequently indicted on criminal charges. After the indictment, defendant Davis called plaintiff into his office and stated that Price would not have been in the position he was in if he had given him [Davis] some money. *Id.* at 395-25 to 396-17).

All of these facts are circumstantial evidence supporting plaintiff's contention that the Department had a "pay to play" policy relating to promotions and other job assignments. It would be extremely difficult, if not impossible, for plaintiff to produce direct evidence that officers in the department were asked to pay for promotions and job benefits. No officer currently working in the Department, or even retired officers, would be likely to agree to provide direct testimony on this issue since it could reasonably be viewed as potentially criminal conduct. The evidence produced by plaintiff is precisely what would be expected in a case such as this and it is sufficient and competent evidence of the "pay to play" scheme alleged in this action.

<u>**POINT III**</u>

**PLAINTIFF'S CLAIMS ARE NOT BARRED
ON THE GROUNDS OF THE DOCTRINE
<u>OF COLLATERAL ESTOPPEL</u>.**

Defendants contend that the issues and claims in this litigation were fully litigated in plaintiff's appeal of the denial of his promotion to the New Jersey Department of Personnel,

and are consequently foreclosed in this action as a result of the operation of the doctrine of collateral estoppel.

Under the doctrine of collateral estoppel, a judgment on the merits in a prior suit bars a second suit involving the same parties based on the same cause of action. *Wheeler v. Nieves*, 762 *F. Supp.* 617, 624. The doctrine "embodies the principle that 'later courts should honor the first actual decision of a matter that has actually been heard and litigated.'" *Id.* (citations omitted).

To invoke this doctrine, it is required that the subsequent action involve substantially similar or identical causes of action, issues, parties and relief as were involved in the prior action. *Id.* (citation omitted). A final judgment by a court of competent jurisdiction is also required. *Id.*

To characterize two causes of action as the same for collateral estoppel purposes, a court should consider (1) whether the wrong for which redress is sought is the same in both actions (that is, whether the acts complained of and the demand for relief are the same), (2) whether the theory of recovery is the same, (3) whether the witnesses and documents necessary at trial are the same and (4) whether the material facts alleged are the same. *Id.*

In this case, plaintiff's appeal of the denial of his promotion to the State of New Jersey Department of Personnel was not based in any way on the allegation that the action was a violation of plaintiff's constitutional rights. The appeal did not

31

address plaintiff's allegations that he was denied the promotion because he refused to pay the proper parties for the privilege. The appeal did not address in any way plaintiff's contention that he suffered adverse consequences in his position as a police officer in retaliation for his support of a fellow police officer.

The wrongs complained of and the relief sought in this action and the appeal process are not even remotely similar. The theory of recovery is not the same or even similar in the two proceedings. The material facts are not the same. The witnesses and documents are not the same. The appeal process did not address the issues in this litigation and the Doctrine of Collateral Estoppel has no applicability to this lawsuit.

### POINT IV

**PLAINTIFF HAS SET FORTH A VIABLE
CAUSE OF ACTION FOR A CEPA VIOLATION.**

Defendants contend that plaintiff has failed to establish a claim under *N.J.S.A.* 34:19-1 *et seq.*, the "Conscientious Employee Protection Act" as a matter of law because he did not show that the defendants took some retaliatory action against him by failing to promote him for refusal to pay and for speaking out against this practice. Defendants argue that plaintiff was not promoted for legitimate reasons, as found by the Merit System Board, as a matter of law.

As discussed in detail above, plaintiff has provided sufficient evidence to withstand a motion to dismiss his complaint and/or for summary judgment, that the defendants' failure to promote him was not the result of the pretextual stated reason, the tie with Harvey Rison for the last spot on the promotion list. Mr. Hinton has provided evidence of disputed issues of material fact as to the real reasons for the denial of his promotion and the adverse actions taken against him in his continued work for the police department after the promotion was denied. Plaintiff has provided substantial evidence of the "pay to play" scheme as well as the pressure put on him to cooperate with the defendants in their prosecution of fellow officer, Norman Price. These issues were not addressed by the Merit System Board and its conclusions have no relevance to this action.

Commonly called the "whistleblower statute," CEPA provides in relevant part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:…
>
> c. [o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> > (1) Is in violation of a law, or a rule or regulation promulgated pursuant to law…;
> > (2) Is fraudulent or criminal; or
> > (3) Is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

33

*N.J.S.A.* 34:19-3.

Plaintiff has established sufficient evidence that the adverse actions taken against him in connection with his employment with the East Orange Police Department were directly related to his refusal to participate in an unlawful "pay to play" scheme and for his support of a fellow police officer, who he reasonably believed to be the subject of an improper criminal investigation. There is sufficient credible evidence in this case to show that Keith Hinton was denied his promotion and then subjected to retaliatory action in the form of undesirable work assignments and harassment as a result of the stands he took on the "pay for play" scheme and his support of Norman Price.

A jury should have the opportunity to determine whether plaintiff suffered improper retaliation as he alleges, or whether as defendants allege, the actions taken against him in his employment were taken for legitimate reasons.

Defendants further argue that the CEPA claim must be dismissed for failure to file within one year. In support of this position, defendants argue that the single act of retaliation, the non-promotion is alleged to have occurred on October 3, 2001. Defendants contend that the plaintiff had to file this action within one year of that event, and since the complaint was not filed until October 1, 2004, it is barred by the statute of limitations.

The plaintiff's claim of alleged retaliation is not based, as defendants contend, simply on the non-promotion. The failure to promote is one aspect of plaintiff's claim. As defendants point out, the plaintiff was not promoted in October 2001, but he attempted to go through the appropriate channels to appeal that decision. A final decision was not issued on the promotion until February 17, 2004. (Ex. 1, p. 4 to East Orange defendants' brief). Until that final decision was issued, plaintiff had the potential to remedy the retaliatory action taken against him for failure to participate in the unlawful "pay to play" scheme through other avenues.

In addition, plaintiff's claim is not solely based on the decision not to promote him, but on the retaliatory action taken against him in the form of unfavorable job assignments. Plaintiff contends that these actions were taken against him both because of his refusal to participate in the "pay to play" scheme and because of his refusal to provide false information against Norman Price to assist in the criminal investigation against him and for his general support of Price.

Plaintiff was asked to provide testimony against Price in the spring of 2004, after Price was suspended from the Department as a result of his indictment. Plaintiff had no knowledge of any criminal activities and could not provide the type of information defendant Davis was seeking. Both Defendants Davis and Jest attempted to intimidate plaintiff with threats of criminal

prosecution if he did not provide false information against Price.

Prior to this time, Keith Hinton had been employed as a police officer with the Department for almost 18 years. During this lengthy career, there were never any sudden changes made to his assignments and/or duties. After these events, however, his duties began to be altered dramatically, as detailed in the Statement of Facts. These changes took place after the Price indictment in January 2004 and increased after this complaint was filed on October 1, 2004.

Even if the primary act of retaliation at issue were, as defendants argue, the failure to promote, plaintiff's complaint is not barred by the statute of limitations. The appeal of the denial of plaintiff's promotion was not finally decided until February 17, 2004. Until that time, plaintiff believed he could resolve the improper failure to promote through official, non-judicial, channels.

The equitable doctrines of the discovery rule and equitable tolling are also available to plaintiff in the circumstances of this case. The discovery rule avoids the mechanical application of a statute of limitations by postponing the accrual of a cause of action, so long as a party is unaware either that he has been injured or that the injury was due to the fault or neglect of an identifiable person. *Villabos v. Fava*, 342 *N. J. Super*. 38 (App. Div. 2001) certification denied, 170 *N.J.* 210. Mr. Hinton did not

know as a certainty that he had been injured by the defendants until there was a final decision on his appeal of the denial of his promotion in February 2004.

In *Keelan v. Bell Commun. Research*, 289 *N.J. Super.* 531 (App. Div. 1996), the Court noted that CEPA is remedial legislation and as such must be liberally construed. In that case, plaintiff received notification on September 23, 1992, that his employment would be terminated on December 2, 1992 and initiated his lawsuit on November 30, 1993. The Court adopted the date of actual termination rather than the date of notification as the date of termination for the CEPA one year limitation period on the ground that an employer could alter a decision up to the time of discharge. *Id.* at 540. Similarly in this case, had the appeal process resulted in a decision favorable to plaintiff, the injury could have been remediated. The plaintiff is entitled to the later date for purposes of the CEPA statute of limitations.

The doctrine of equitable tolling assumes the accrual of the action but intercepts and delays the bar of the statute of limitations because the plaintiff lacked vital information which was withheld by a defendant. *Villabos, supra,* at 46. This doctrine also acts to preserve Mr. Hinton's CEPA claim in this case. As set forth in the Statement of Facts above, the defendants were not direct in their "pay to play" scheme statements. The defendants were intentionally vague and ambiguous. It took plaintiff years to develop the information to confirm his understanding that he was

37

asked to pay for his promotion. Most of the corroboration was developed during the course of discovery in this litigation when it was revealed that Stephen Lewis did in fact solicit payment from various police officers for a non-existent Legal Defense Fund. The defendants intentionally withheld the true facts of this action from Mr. Hinton and should not be allowed to benefit from their deception by invoking the shield of the statute of limitations.

## POINT V

**THE CITY OF EAST ORANGE AND THE EAST ORANGE POLICE DEPARTMENT ADOPTED THE WRONGFUL ACTS OF THE INDIVIDUAL DEFENDANTS AND THE MOTION TO DISMISS THE THIRD, FIFTH AND SIXTH COUNTS OF THE COMPLAINT MUST BE DENIED.**

Defendants argue that plaintiff, "by inference" alleges liability on the part of the City of East Orange and the East Orange Police Department on a theory of respondeat superior. Defendants contend that these defendants cannot be held liable to plaintiff as a matter of law on this theory. Genuine issues of material fact exist as to these claims and defendants motion for summary judgment on this basis should be denied.

The four major elements of a Section 1983 claim are (a) conduct by a "person"; (b) who acted under "color of state law"; (c) proximately causing; (d) a deprivation of federally protected rights.

A wide range of federal constitutional and federal statutory rights may be enforced under Section 1983. *See Wilson v. Garcia*, 471 *U.S.* 261, 273 (1985).          Municipalities and municipal officials who are sued in either an official or personal capacity are Section 1983 persons. *Monell v. Department of Social Services*, 436 *U.S.* 658 (1978). Officials who abuse official power act under color of state law. *Monroe v. Pape*, 365 *U.S.* 167 (1961).

A Section 1983 defendant may be held liable for "reasonably foreseeable consequences attributable to intervening forces, including acts of third parties." *Warner v. Orange County Dept. of Probation*, 115 *F. 3d* 1068, 1071 (2d Cir. 1996).

A claim against an official in his official capacity is treated as a claim against the entity itself. *Kentucky v. Graham v. Graham*, 473 *U.S.* 159 (1985).

Municipal liability may be based upon a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnick*, 485 *U.S.* 112, 127 (1988), (quoting *Adickes v. S.H. Kress & Co.*, 398 *U.S.* 144, 167-68 (1970). Decisions officially adopted by the government body itself need not have general or recurring application to constitute official "policy". *City of Newport v. Fact Concerts, Inc.,* 453 *U.S.* 247 (1981).

Section 1983 liability against a municipality may arise from deliberately indifferent supervision or discipline or deliberately

39

indifferent hiring. *See Board of County Commissioners of Bryan County v. Brown*, 117 *S. Ct.* 1382 (1997). Section 1983 liability may also arise from deliberately indifferent failure to adopt policies necessary to prevent constitutional violations. *See e.g., Oviatt v. Pearce*, 954 *F. 2d* 1470 (9th Cir. 1992).

In this case, defendants were made fully aware of the improper conduct of the police department regarding plaintiff's promotion application, at the very least from this litigation. Defendants were made aware that when the personnel files of plaintiff and Harvey Rison were reviewed in connection with plaintiff's promotion application, Rison's file was purged of the two disciplinary charges against him, making it appear that plaintiff's sole disciplinary charge made him the less qualified eligible officer for the promotion.

Lt. Davis testified during his deposition that if he had been aware of the purging of Rison's file, he would have initiated an investigation on the part of the Internal Affairs Department. Notwithstanding the fact that defendants have been made aware of the purging, no investigation into this incident has ever taken place. The failure to make any effort whatsoever to address this serious charge is an adoption of this policy by the City of East Orange and the East Orange Police Department. It also casts doubt on Davis' credibility and could lead one to reasonably conclude that he was involved in the purging.

In addition, as the result of this lawsuit, defendants are aware of the serious allegations made by plaintiff of the "pay to play" practice within the Police Department. No effort has been made to investigate these allegations, thus constituting an adoption of this policy on the part of the City of East Orange and the East Orange Police Department.

In order to impose liability against a municipality on the basis of deliberately indifferent supervision, the Third Circuit has held that the supervisor must have had knowledge of an acquiesced in unlawful conduct. *Rode v. Dellaciprete*, 845 *F. 2d* 1195 (3d Cir. 1988).

*Monell, supra*, allows the imposition of government liability not only when the challenged conduct executes or implements a formally adopted policy, but also when that conduct reflects "practices of state officials so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell,* 436 *U.S.* at 691. In *Bowman v. Block*, 940 *F. 2d* 1211 (9th Cir. 1991), the Court held that:

> [I]f a practice is so permanent and well settled as to constitute a 'custom or usage' with the force of law, a plaintiff may proceed…despite the absence of written authorization or express municipal policy.

The "custom or usage" in question will be attributed to the government body when the

> duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the governing

41

> body…[or policymaker with responsibility for
> oversight and supervision] that the practices
> have been customary among its employees.
>
> *Spell v. McDaniel*, 824 *F. 2d* 1380, 1387 (4th
> Cir. 1987).

In *Britton v. Maloney*, 901 *F. Supp.* 444, 450 (D. Mass. 1995), the Court distinguished a "policy" from a "custom". "Unlike a 'policy', which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up. Thus, the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it."

In *Blair v. City of Pomona*, 223 *F. 3d* 1074, 1080, 1081 (9th Cir. 2000) (as amended), the Court denied a motion for summary judgment on behalf of the defendant City Department because it found that:

> The evidence, if believed by the jury, would
> be sufficient to establish that the Department
> had the custom of chastising whistleblowers.
> It would also be sufficient to establish that
> the Department had failed to train its members
> not to retaliate against whistleblowers and/or
> that the Department had failed to discipline
> those members of the Department who retaliated
> against whistleblowers. It would be open to
> the jury to conclude that one or more of these
> customs or policies was made by those in
> charge of the Department who were aware of the
> police code of silence; that the custom or
> policy amounted to at least deliberate
> indifference to Blair's right to speak; and
> that the policy was the moving force resulting
> in the constitutional deprivation suffered by
> Blair….The evidence presented to the district
> court, if believed at trial, and the
> inferences if drawn by the jury, would justify

the conclusion that the Department had a
custom, approved by its policy-makers, of at
the very least deliberate indifference to the
right of a member of the Department to report
to a superior the misconduct of a fellow
officer.  The seriousness of such a custom and
the need of a civil rights remedy for it is
underlined by what has been observed around
the country as to the code of silence in
police departments.

A Section 1983 plaintiff may establish a municipality's
liability by demonstrating that the actions of subordinate
officers are "sufficiently widespread to constitute the
constructive acquiescence of senior policymakers." *See Sorlucco v.
New York City Police Department,* 971 *F. 2d* 864, 871 (3d Cir.
1992).

A longstanding and widespread practice is deemed authorized
by the policymaking officials because they must
have known about it but failed to stop it. *See Blair, supra.*

As stated by the Third Circuit in *Andrews v. City of
Philadelphia*, 895 *F. 2d* 1469, 1481 (3d Cir. 1990), "it is
impossible on the delivery of a kick to inculpate the head and
find no fault with the foot."

In *Eddy v. City of Miami*, 715 *F. Supp.* 1553, 1555 (S.D. Fla.
1989), the Court held that "A municipality's continuing failure to
remedy known unconstitutional conduct of police officers is a type
of informal policy or custom that is amenable to suit under
Section 1983."

43

Under some circumstances, having no policy may constitute deliberate indifference. In *Reynolds v. Borough of Avalon*, 799 *F. Sup.* 442, 447 (D.N.J. 1992), the Court held that "…a reasonable jury might find that the risk of sexual harassment in the workplace is so obvious that an employer's failure to take action to stop it from occurring—even in the absence of actual knowledge of its occurrence—constitutes deliberate indifference, where the employer also has failed to take any steps to encourage the reporting of such incidents."

In this case, the City of East Orange remained deliberately indifferent to and/or actively condoned a long history of violations on the part of its Police Department. The allegations of "pay to play" have been raised by various individuals over the course of years. With respect to this particular case, the City of East Orange has totally disregarded the outrageous allegation that the personnel of Harvey Rison was intentionally purged of the disciplinary charges against him to provide a justification for promoting Rison over plaintiff. The City of East Orange has not made any effort to investigate that incident to the present day. The City further has never made any attempt to look into the "pay to play" allegations made by Mr. Hinton, choosing to remain deliberately indifferent to this unlawful conduct and allowing it to continue.

The deliberate indifference on the part of the City of East Orange fostered an atmosphere that resulted in the continued

44

violation of plaintiff's constitutional rights and harassment of
Mr. Hinton on the job. As a result of the City's adoption of this
unlawful conduct, Chief Grimes was enabled to issue a written
directive requiring plaintiff's supervisors to be aware of his
whereabouts all day, everyday, and to have them submit a written
report to the Chief regarding plaintiff's activities. (T. Hinton,
6/15/05, 116-25 to 117-14; Certification of Keith Hinton).

As a result of this adopted policy, defendant Michael Pyczko
was enabled to intensify the harassment of plaintiff on the job on
a daily basis. He stepped into Antonovich's role and simply
continued the unlawful policy. Thus the flow of "to/froms." Chief
Cleary became Chief of Police after Chief Grimes' retirement. When
he became Chief, he certainly became aware of the unusual
directive issued by his predecessor to scrutinize plaintiff's
daily activities to this extreme degree. He did nothing to review
the harassing policy and never rescinded Chief Grimes' directive.

As a result of this policy, plaintiff's supervisors felt
enabled to totally disregard his legitimate request for a leave of
absence to run for political office.

Mr. Hinton has demonstrated sufficient evidence and raised
factual issues to show that that the City of East Orange acted
with deliberate indifference to the risk that his constitutional
rights would be violated.

Deliberate indifference can be shown by evidence that the
municipality had notice of, but repeatedly failed to make any

45

meaningful investigations into charges that its agents were violating citizens' constitutional rights. *See DeCarlo v. Fry,* 141 *F. 3d* 57, 61-62 (2d Cir. 1998). In this case, the City of East Orange is fully aware of the allegations of improprieties relating to the purging of the Rison file and the "pay to play" scheme and has simply ignored its responsibility to take steps to stop this continued violation of rights and laws.

Plaintiff's Amended Complaint sufficiently pleads that he suffered a constitutional injury as a result of the harm inflicted by these defendants. This is the threshold issue in a Section 1983 action. *See Trigalet v. City of Tulsa*, 239 *F. 3d* 1150 (10th Cir. 2001).

The City of East Orange and the East Orange Police Department must be held accountable for the misconduct they have approved or fostered, in the circumstances of this case. *See Mark v. Borough of Hatboro*, 51 *F. 3d* 1137 (3d Cir. 1995).

The City of East Orange gave the East Orange Police Department free reign over the manner in which they dealt with Mr. Hinton. The City made these defendants the final decisionmakers with respect to Mr. Hinton's employment with the police department and the City can be held liable for their actions accordingly. *See Adkins v. Bd. Of Ed. Of Magoffin County*, 982 *F. 2d* 952, 959 (6th Cir. 1993).

For purposes of this summary judgment motion, genuine issues of fact remain as to whether the final policymaking authority was

delegated to Chief Grimes and other members of the Police
Department. *See Chow v. Gates*, 27 *F. 3d* 1445 (9th Cir. 1994). In
*Chow*, the Court held that a city cannot escape liability for the
consequences of established and ongoing departmental policy
decisions to be made by lower level officials who are not
ordinarily considered policymakers. Here Grimes is the policymaker
for the East Orange Police Department, as Cleary became when he
took on the role as Chief of Police.

In *Coleman v. Kaye*, 87 *F. 3d* 1491, 1499-1506 (3d Cir. 1996),
the Third Circuit held that for Section 1983 purposes, a New
Jersey County Prosecutor made a policy for the county when
refusing to promote an investigator.
Based on the holdings in *Monell v. Dept. of Social Services of
City of New York,* 436 *U.S.* 658, 690-91 (1978) and *Pembraur v.
Cincinnati*, 475 *U.S.* 469 (1986), the "official policy" requirement
need amount to no more than a conscious or deliberate indifference
to the constitutional rights of persons with whom the police come
into contact. *See City of Canton v. Harris*, 489 *U.S.* 378.

Deliberate indifference can shown by the fact that a
municipality is aware of and acquiesces in a pattern of
constitutional violations involving the exercise of police
discretion.

There is a line of cases holding that in seeking to identify
the policymaker, the plaintiff need do no more than identify the
person who sets policy for the police department,

the Chief of Police in almost every instance. *See Keenan v. City of Philadelphia*, 983 *F. 2d* 459, 468-69 (3d Cir. 1992). In this case, the plaintiff has established evidence that the Chief of Police of the East Orange Police Department was directly involved in setting the policy that resulted in the deprivation of his constitutional rights. The Chief of Police established a written policy making it mandatory for every officer supervising plaintiff to monitor Hinton's activities "all day/every day" and report to the Chief on his activities. This policy was created for no other reason than to harass Hinton and make it impossible for him to continue in his career as a police office.

Plaintiff has produced sufficient evidence that Chief Grimes was aware of and participated in the "pay for play" scheme. Officers Jackson and Price testified as to the conversation between Chief Grimes and Norman Price during which Grimes instructed Price to talk to the appropriate persons to arrange to pay to "move the list" for his own promotion.

After Chief Grimes' retirement, Chief Cleary continued the harassment of plaintiff by refusing to consider Hinton's legitimate request for a leave of absence to run for elective office. This type of request was granted with respect to other officers, but completely ignored in Hinton's case. In fact, one such officer, Detective Fred Townes, seeking to run against the sitting Mayor was allowed to run after his attorney, Patrick Toscano, wrote a threatening correspondence. (Exhibit 9).

48

Plaintiff was to be a member of Townes' ticket. (T. Townses, Exhibit 22, pp. 10, 14-15, 17-18, 20-25).

When an individual official does have final policymaking authority in a particular area, his personal act may be sufficient to impose liability upon the municipality. *See Brady v. Fort Bend County*, 145 *F. 3d* 691, 698 (5th Cir. 1998).

The existence of a pattern or practice of unconstitutional behavior at lower levels of a municipal agency is circumstantial evidence from which a jury can infer the existence of official policy emanating from the highest policy-setting level. *Beck v. City of Pittsburgh*, 89 *F. 3d* 966 (9th Cir. 1996).

> In order to establish the liability of a municipality in an action under Section 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy…This does not mean that the plaintiff must show that the municipality had an explicitly stated rule or regulation….A Section 1983 plaintiff may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference….To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious…. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no municipality to investigate or to forestall further incidents….
>
> *Vann v. City of New York*, 72 *F. 3d* 1040, 1049 (2d Cir. 1995).

49

In this case, plaintiff has established genuine issues of material fact as to whether the City of East Orange acted with deliberate indifference in the circumstances of this case. The City of East Orange was fully aware of the pattern of abuse of plaintiff's constitutional rights by its Police Department, yet chose to remain deliberately indifferent to its obligation to make sure that these violations did not recur. The City of East Orange's and the East Orange Police Department's motion for summary judgment should be accordingly denied.

In *Pembaur v. City of Cincinnati*, 475 *U.S.* 469, 106 *S. Ct.* 1292, 89 *L. Ed. 2d* 452 (1986), the Supreme Court held that the county could be held liable under Section 1983 based on the fact that a county prosecutor, acting as the final decision maker for the county, ordered deputy sheriffs to enter a physician's clinic to serve capiases on third parties in an investigation of alleged welfare fraud.

During a Grand Jury investigation of the physician, subpoenas were issued for the appearance of two of his employees. The employees failed to appear and the Prosecutor obtained capiases for their detention. When two County Deputy Sheriffs attempted to serve the capiases at plaintiff's clinic, he barred the door and refused to let them enter the building. The officers called the Prosecutor's Office and the County Prosecutor told the Sheriffs to "go in and get" the employees. The officers eventually obtained an

axe and chopped down the door. They then entered the clinic, but did not find the employees there.

The plaintiff was eventually acquitted of the fraud charges. Plaintiff subsequently brought an actin under Section 1983 against the county, among other defendants, alleging that the county had violated his rights under the Fourth and Fourteenth Amendments. The District Court dismissed the claim against the county on the ground that the individual officers were not acting pursuant to the kind of "official policy" that is the predicate for municipal liability under *Monell v. New York City Dept. of Social Services,* 436 *U.S.* 658, 98 *S. Ct.* 2018, 56 *L. Ed. 2d* 611. The Court of Appeals affirmed, holding that petitioner had failed to prove the existence of a county policy because he had shown nothing more than that on "this

one occasion" the Prosecutor and the Sheriff decided to force entry into petitioner's clinic. The Supreme Court reversed.

> The "official policy" requirement of *Monell* was intended to distinguish acts of the *municipality* from the acts of the municipality's *employees*, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible. *Monell* held that recovery from a municipality is limited to acts that are, properly speaking, "of the municipality," *i.e.*, acts that the municipality has officially sanctioned or ordered. With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. If the decision to adopt a particular course of action is directed by those who establish governmental policy, the

51

> municipality is equally responsible whether
> that action is to be taken only once or to be
> taken repeatedly.

*Pembaur,* 106 *S. Ct.* at 1297-1299.

The *Pembaur* Court held that it was error to dismiss the petitioner's claim against the county. Ohio law authorized the County Sheriff to obtain instructions from the County Prosecutor. The Sheriff followed the practice of delegating certain decisions to the Prosecutor where appropriate. In this case, the Deputy Sheriffs received instructions to follow the orders of the County Prosecutor, who made a considered decision based on his understanding of the law and commanded the Deputy Sheriffs to enter petitioner's clinic. That decision directly caused a violation of petitioner's Fourth Amendment rights. In ordering the Deputy Sheriffs to enter petitioner's clinic to serve the capiases on the employees,

the County Prosecutor was acting as the final decisionmaker for the county, and the county may therefore be held liable under Section 1983.

The *Pembaur* Court discussed the *Monell* decision, on which defendants rely in support of their motion for summary judgment in this case:

> *Monell* is a case about responsibility. In the
> first part of the opinion, we held that local
> government units could be made liable under
> Section 1983 for deprivations of federal
> rights…. In the second part of the opinion, we
> recognized a limitation on this liability and
> concluded that a municipality cannot be made

52

> liable by application of the doctrine of
> *respondeat superior*…. Primarily, however, our
> conclusion rested upon the legislative
> history, which disclosed that, while Congress
> never questioned its power to impose civil
> liability on municipalities for their *own*
> illegal acts, Congress did doubt its
> constitutional power to impose such liability
> in order to oblige municipalities to control
> the conduct of others.

*Pembaur, supra,* 106 *S. Ct.* at 1297-1298.

When the municipality has committed its own violation of a

plaintiff's rights, through a final decisionmaker like Chief of

Police Grimes in this case, municipal liability may be imposed.

"No one has ever doubted, for instance, that a municipality may be

liable under Section 1983 for a single decision by its properly

constituted legislative body—whether or not that body had taken

similar action in the past or intended to do so in the future—

because even a single decision by such body unquestionably

constitutes an act of official

government policy. *Id.,* 106 *S. Ct.* at 1299 (citing *Owen v. City of*

*Independence,* 445 *U.S.* 622, 100 *S. Ct.* 1398, 63 *L. Ed. 2d* 673

(City Council passed resolution firing plaintiff without a

pretermination hearing); *Newport v. Fact Concerts, Inc.,* 453 *U.S.*

247, 101 *S. Ct.* 2748, 69 *L. Ed. 2d* 616 (1981) (City Council

canceled license permitting concert because of dispute over

content of performance).

The *Pembaur* Court held:

> The power to establish policy is no more the
> exclusive province of the legislature at the

53

local level than at the state or national
level. *Monell's* language makes clear that it
expressly envisioned other officials 'whose
acts or edicts may fairly be said to represent
official policy, *Monell, supra*, 436 *U.S.* at
694, 98 *S. Ct.* at 2037-2038, and whose
decisions therefore may give rise to municipal
liability under Section 1983.

"Where action is directed by those who establish governmental
policy, the municipality is equally responsible whether that
action is to be taken only once or repeatedly. To deny
compensation to the victim would therefore be contrary to the
fundamental purpose of Section 1983." *Pembaur, supra,* 106 *S. Ct.*
at 1299.

Municipal liability attaches where the decisionmaker, like
Chief of Police Grimes in this case, possesses final authority to
establish municipal policy with respect to the action ordered. The
defendants have conceded that defendant Grimes is a final
decisionmaker with respect to the decisions
made in this action. He sought the indictment of Norman Price at
all costs and acted with complete disregard for the rights of all
who "got in the way" of the prosecution, including plaintiff.
Defendants attempt to evade the conclusion that Chief Grimes acted
as a policymaker by arguing that he did not have the ultimate
authority for promotions decisions. Defendants never deny,
however, that Chief Grimes played a major role in determining who
would ultimately be promoted.

54

Chief Grimes further does not deny issuing the written directive requiring plaintiff's supervisors to harass him on the job and make it impossible for him to continue working as a police officer in the Department. Further, Cleary did nothing to stop the harassment which had been predicated upon a "tip." Grimes had issued a memo to Antonovich to this effect, but defendants claim that they cannot locate this document.

After Chief Grimes' retirement, Chief Cleary continued the harassment, refusing to consider plaintiff's request for a leave to run for political office.

Whether an official had final policymaking for the decision at issue is a question of state law. *Pembaur, supra,* 106 *S. Ct.* at 1300. "Municipalities often spread policymaking authority among various officers and official bodies." *Id.* "To hold a municipality liable for actions ordered by such officers exercising their policymaking authority is no more an application of the theory of *respondeat superior* than was holding the municipalities liable for the decisions of the City Councils in *Owen and Newport, supra.*" *Id.*

The *Pembaur* Court held that "…municipal liability under Section 1983 attaches where--and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.*

In this case, Chief of Police Grimes made a deliberate decision to seek the indictment of Norman Price at all costs, and to retaliate against plaintiff for refusing to provide false information in support of that indictment. Chief Grimes orchestrated the harassment of plaintiff and played a major role in denying him his rightful promotion in retaliation for his failure to pay for this advancement. Grimes, a final decisionmaker, made this decision consciously and the City of East Orange and the East Orange Police Department is liable for his action.

The defendants have not established that there are no genuine issues of material fact in this case as to the liability of the City of East Orange or the East Orange Police Department to the plaintiff, and, therefore, the motion for summary judgment should respectfully be denied.

<u>POINT VI</u>

**PLAINTIFF HAS ESTABLISHED GENUINE
ISSUES OF MATERIAL FACT REGARDING
HIS FIRST AMENDMENT CLAIMS AND
<u>SUMMARY JUDGMENT SHOULD BE DENIED.</u>**

Defendants contend that plaintiff's First Amendment claim must be dismissed on the grounds that plaintiff was not engaged in a protected activity.

Public employees may sue to enforce the constitutional protection of their speech if: "(1) they spoke on a matter of public concern; (2) their interest in that field outweighs the

government's concern with the effective and efficient fulfillment of its responsibilities to the public; (3) the speech caused the retaliation; and (4) the adverse employment decisions would not have occurred but for the speech." *Fogarty v. Boles,* 121 *F.* 3d 886, 888 (3d Cir. 1997). In order to survive summary judgment, a plaintiff need only show that "a trier of fact could find that plaintiffs' protected conduct played a substantial role" in causing the retaliatory acts. *Suppan v. Dadona*, 203 *F. 3d* 228, 237 (3d cir. 2000). In other words, the plaintiff does not need to establish element four, but-for causation, until trial. *See id.* at 236. It is the court's duty to determine whether an issue is a matter of public concern, and whether the plaintiff's interest in expression outweighs the government's intent in limiting it. *See Green v. Philadelphia Hous. Auth.*, 105 *F. 3d* 882, 887-88 (3d Cir.).

The integrity of public officers, and public tribunals, is a matter of public concern. *See Baldassare v. New Jersey,* 250 *F. 2d* 188, 195 (3d Cir. 2001).

In *Sunkett v. Misci*, *183 F. Supp. 2d* 691 (D.N.J. 2002), the plaintiffs were several African-American city attorneys who brought an action against the city, mayor, city attorney, and other city officials, alleging violations of their First Amendment rights, among other claims, based on improper actions taken by the City Attorney's office after the election of a new mayor. One of the plaintiffs alleged that his free speech rights were violated

57

when he suffered adverse employment consequences after voicing complaints over the decision to terminate the employment of another city attorney. The Court found that the plaintiff had successfully established a prima facie case for his complaints about the termination, concluding that a reasonable fact finder could find that the firing was contrary to law. The Court found that the plaintiff's speech concerned possible government misfeasance, and was therefore a matter of public concern. *Id.* at 713.

Employees of federal and state government do not relinquish their First Amendment rights to comment on matters of public interest as a condition of their government employment. *Pickering v. Board of Education*, 391 *U.S.* 563, 568, 88 *S. Ct.* 1731, 20 *L. Ed. 2d* 811 (1968).

In *Cox Broadcasting Corp. v. Cohn*, 420 *U.S.* 469, 95 *S. Ct.* 1029, 43 *L. Ed. 2d* 328 (1975), the Court stated that the standard for determining whether a topic is a legitimate matter of public concern is functional, asking whether there is a public benefit in reporting the matter. 420 *U.S.* at 495, 95 *S. Ct.* 1029.

Defendants contend that plaintiff's speaking up in support of fellow officer Norman Price is not protected speech because this was a personal issue, not a matter of public concern. Plaintiff's speech, however, was on a matter of public concern. Keith Hinton was concerned about a fellow police officer receiving fairness and essentially due process in a criminal investigation. He had no way

of knowing at the time that he spoke whether Norman Price was guilty or not guilty of the charges being made against him. Keith Hinton believed, however, that Price was entitled to a presumption of innocence, as any other person would be in the circumstances. Hinton, accordingly, spoke up in favor of Price at a police union meeting voicing his opinion that the union should provide legal representation for Price with respect to these charges, as it would for another officer accused of wrongdoing.

Hinton also refused to provide false testimony against Price when defendants pressured him to do so, despite their threats of false criminal prosecution against him personally.

The issue of fairness in criminal prosecution is a matter of public concern and defendants' motion for summary judgment should be denied.

Finally, plaintiff's request for a leave of absence to run for political office is a First Amendment issue as well. Defendants infringed on plaintiff's First Amendment rights by ignoring his request for a leave and ultimately denying the request.

### POINT VII

#### PLAINTIFF HAS MADE A SUFFICIENT SHOWING OF A DENIAL OF DUE PROCESS TO WITHSTAND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

"Due Process" is not a fixed concept, but a flexible doctrine that varies with particular circumstances. *VandeZilver v. Rutgers*,

971 *F. Supp.* 925 (D.N.J. 1997). The exact contours of due process cannot be defined; what it commands depends upon the specific facts presented.

Substantive due process protects against the most egregious governmental abuses that shock the conscience or otherwise offend judicial notions of fairness. *In re Certificate of Need Granted to the Harborage*, 300 *N.J. Super.* 363 (App. Div. 1997). In this case, accepting for the purposes of this motion that plaintiff's allegations are true, the defendants' actions are egregious governmental abuses that shock the conscience. Threatening to fabricate false criminal charges against a citizen if he refuses to provide false testimony against another individual who is the subject of a criminal investigation is an egregious offense. Refusing to grant someone a promotion to which he is otherwise entitled because he refuses to pay for the advancement is an egregious offense. Retaliating against an individual in his employment by harassing him on the job and making it impossible for him to continue to perform in that position is an egregious offense. The defendants' actions deprived Keith Hinton of his livelihood. He was denied a promotion and the benefits associated with that promotion. He was deprived of the opportunity to continue working in his secondary job by the change in his work assignment, which cost him a substantial portion of his income. His position with the East Orange Police Department

was made impossible that he had no alternative but to leave the Department after almost 20 years as an officer.

The aim of due process is to prevent fundamental unfairness. The constitutional limitations in the 14th Amendment and in the due process and equality clauses of the state constitution safeguard the fundamental rights of persons and property against arbitrary and oppressive state action. *Washington Nat. Ins. Co. v. Board of Review of NJ Unemployment Compensation Comm'n*, 1 *N.J.* 545 (1949).

Essentially, due process rights are found whenever an individual risks governmental exposure to a grievous loss. *State in Interest of D.G.W.*, 70 *N.J.* 488 (1976). In this case, Keith Hinton undeniably faced exposure to a grievous loss at the hands of these defendants. He faced potential loss of his liberty when he was threatened with false criminal prosecution, his property, his career with the police department and his pension, as well as his reputation in the community.

Whenever a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, a property interest is involved and due process requirements apply. *San Filippo v. Bongiovanni*, 961 *F. 2d* 1125 (3d Cir. 1992), certiorari denied, 113 *S. Ct.* 305, 506 *U.S.* 908, 121 *L. Ed. 3d* 228.

Plaintiff has established genuine issues of material fact as to how the alleged retaliation on the part of these defendants and their threat of criminal prosecution, harassment and denial of

leave to run for office deprived him of a property interest and defendants' motion for summary judgment should be denied.

### POINT VIII

**PLAINTIFF HAS MADE A SUFFICIENT SHOWING OF AN ACTUAL INJURY TO ESTABLISH A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.**

Defendants assert that plaintiff's claim for damages based on their intentional infliction of emotional distress must be denied primarily because plaintiff did not provide medical reports of expert testimony to support their claims. This type of evidence is not essential to plaintiff's claim.

In *Carey v. Piphus*, 435 *U.S.* 247, 98 *S. Ct.* 1042, 55 *L. Ed. 2d* 252 (1978), the Court concluded that Section 1983 "was intended to '[create] a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." *Id.* at 253, 98 *S. Ct.* at 1047 (alteration in original) (quoting *Imbler v. Pachtman*, 424 *U.S.* 409, 417, 96 *S. Ct.* 984, 988-89, 47 *L. Ed. 2d* 128 (1976)). Damages awarded pursuant to Section 1983 "…often find their genesis in the common law of torts, and the gravamen of tort law is 'compensation for the injury caused to plaintiff by defendant's breach of duty.'" *Id.* at 255, 98 *S. Ct.* at 1047. Damages are available under Section 1983 for actions "found…to have been violative of…constitutional rights and to have caused compensable injury…." *Id.* at 255, 98 *S. Ct.* at 1047 (citation omitted). *The Carey* court

62

explained that the courts must not lose sight of the fact that such a plaintiff suffered a constitutional violation, and the federal courts must provide a remedy for the wrong suffered. *See id.* at 266, 98 *S. Ct.* at 1053-54. *Carey* concluded that damages for emotional distress are available under Section 1983.

The *Carey* Court concluded that in order for a plaintiff to recover more than nominal damages for emotional distress, he had to produce evidence that his mental and emotional distress actually was caused by the [constitutional violation]. "Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." *Id.* at 263-64, 98 *S. Ct.* at 1052.

The *Carey* Court explained that compensatory damages for emotional distress must be attributed to the actual constitutional violation, and must be proved by a sufficient quantum of proof demonstrating that the violation caused compensable injury. *Id.* at 263, 98 *S. Ct.* at 1052. The injury must flow from the constitutional violation.

In *Memphis Community School District v. Stachura*, 477 *U.S.* 299, 106 *S. Ct.* at 2543, the Court reaffirmed the principles of *Carey*. In describing the types of injury for which compensatory damages may be recovered pursuant to Section 1983, the *Stachura* Court observed that "…impairment of reputation…, personal humiliation, and mental anguish and suffering" damages could be awarded. *Id.* at 306, 106 *S. Ct.* at 2542043 (citation omitted). The

*Stachura* Court reaffirmed *Carey* by stating that "…the basic purpose of Section 1983 damages is 'to compensate persons for injuries that are caused by the deprivation of constitutional rights." *Id.* at 307, 106 S. Ct. at 2543 (quoting *Carey*, 435 *U.S.* at 254, 98 *S. Ct.* at 1047).

*Carey* observed that damages for emotional distress for a constitutional violation are "customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff,…and such injury may be evidenced by one's conduct and observed by others." *Carey*, 435 *U.S.* at 263-64, 98 *S. Ct.* at 1052. *Carey* requires evidence of emotional distress sufficient to convince the trier of fact that such distress did in fact occur and that its cause was the constitutional deprivation itself and cannot be attributable to other causes. *Id.* at 259, 98 *S. Ct.* at 1050.

A survey of the case law reveals that a plaintiff's testimony, standing alone, may support a claim of emotional distress precipitated by a constitutional violation. *See, e.g., Biggs v. Village of Dupo*, 892 *F. 2d* 1298, 1304 (7th Cir. 1990); *Spence v. Board of Educ. Of Christina Sch. Dist.,* 806 *F. 2d* 1198, 1201 (3d Cir. 1986); *Chalmers v. City of Los Angeles*, 762 *F. 2d* 753, 761 (9th Cir. 1985); *Williams v. Trans World Airlines, Inc.*, 660 F. 2d 1267, 1272-73 (8th Cir. 1981); *Nekolny v. Painter,* 653 *F. 2d* 1164, 1172-73 (7th Cir. 1981), *cert. denied*, 455 *U.S.* 1021, 102

64

*S. Ct.* 1719, 72 *L. Ed. 2d* 139 (1982); *Bolden v. Southeastern Pa.*

*Transp. Auth.*, 21 *F. 3d* 29,

34-36 & n. 3 (3d Cir. 1994) (generally endorsing this view, but

specifically holding that medical evidence was not necessary to

prevail on a claim for emotional distress); *Marable v. Walker*, 704

*F. 2d* 1219, 1220 (11th Cir. 1983) (holding that plaintiff's own

testimony of emotional distress was sufficient to warrant an

evidentiary hearing and award of compensatory damages).

In *Spence*, *supra,* The Court affirmed a remittitur based upon

lack of evidence to support an award of damages for emotional

distress in a Section 1983 case. In that case, unlike the present

case, the plaintiff testified about her distress but produced no

evidence that her peers thought less of her, that she had lost

income or that she had suffered physically from or had undergone

counseling for emotional distress in the wake of the incident for

which she claimed damages. *Spence*, 806 *F. 2d* at 1201.

In *Bolden, supra,* the Court held that although the plaintiff

had offered no evidence of physical effects or of

having received counseling, a jury could have inferred that

emotional distress from the income he lost as a result of the

constitutional violation. *Bolden,* 21 *F. 3d.* at 33. In *Bolden,* the

defendant argued that even if plaintiff's evidence of emotional

distress was sufficient, as a matter of law the plaintiff could

not recover for emotional distress absent expert medical testimony

to establish that he actually suffered it. The Court rejected this argument, stating that

all of the courts of appeals that have expressly considered this issue have held to the contrary. *Id.* at 34.

The *Bolden* Court reasoned that *Carey's* requirement that actual injury be proven before a plaintiff may recover serves merely to ensure that plaintiffs are not compensated for illusory injury. "We must bear in mind that the civil rights laws are intended in part to provide broad, consistent recompense for violations of civil rights. *Id.* at 35 (citations omitted). The *Bolden* Court stated that "[I]n light of the purpose of the civil rights laws we have described, we see no reason to require that a specific type of evidence be introduced to demonstrate injury in the form of emotional distress." *Id.* at 36.

The requisite amount of proof varies with the circumstances presented. *Pica v. Sarno*, 907 *F. Supp.* 795, 803 (D. N.J. 1995). Testimony of laypersons, including the plaintiff, may be sufficient evidence of emotional distress to overcome a summary judgment action. *Id.* at 804.

In this case, the circumstances are sufficient to establish an issue as to whether plaintiff sustained an actual injury and suffered emotional distress. Keith Hinton testified that this incident caused him to suffer severe emotional distress. As a police officer, it is essential to the performance of his duties that he have confidence in the support of his fellow officers.

66

Because he stood up for Norman Price and asked that he be treated fairly in this criminal prosecution, Hinton testified that the support of his fellow officers was destroyed. "In my line of work it's like if I need back up out in the street. I know who is not coming. I know Paul Davis is not going to come. I know Jest or Moseby or Pyczko, I can't expect help from those individuals who are in power over me." (T. Hinton, 130-3 to 130-8).

Hinton testified that he worries that his children and his family might be the subject of an attack. (*Id.* at 130-8 to 130-9). Because he was forced out of his career as a police officer, Hinton testified that he reasonably worries about how he will put his children through college. (*Id.* at 130-100 to 13-13).

The emotional distress suffered as a result of the defendants' wrongful conduct has affected Mr. Hinton's sleep. (*Id.* at 130-15 to 130-16). Although Mr. Hinton testified that he discussed this emotional distress with his medical doctor, he testified that he was reluctant to seek treatment because he felt it might further jeopardize his work as a police officer in the future.(*Id.* at 130-17 to 130-24).

The law does not require Mr. Hinton to provide evidence of medical treatment or medical expert testimony in order to recover for this emotional distress.

Plaintiff has satisfied the requirements necessary to prove an actual injury for the emotional distress he suffered as a result of this constitutional violation pursuant to the standard

67

discussed in the cases above, and defendants' motion for summary judgment and/or to dismiss the complaint should properly be denied.

### POINT IX

**PLAINTIFF HAS ESTABLISHED A VIABLE CLAIM FOR DENIAL OF LEAVE OF ABSENCE TO RUN FOR PUBLIC OFFICE.**

Plaintiff claims that among the acts of retaliation taken against him by the defendants was their failure to respond to his request for a leave of absence to allow him the opportunity to run for elective office. Defendants do not dispute that plaintiff made a formal request for this leave to run for office as a city council member. (Exhibit 11). The defendants do not dispute that plaintiff's request was ignored for a long period of time. (Exhibits 10, 12). They contend that the request was ultimately denied, although such requests were granted for other officers. It is defendants' argument that plaintiff's claim must be dismissed because, as a matter of law, plaintiff was not entitled to this leave.

The right to run for public office is not a fundamental right, but it is an important right. The First Amendment affords some protection to an individual's right to seek public office. The right to run for public office is also constitutionally protected as a liberty interest under the Fourteenth Amendment. Absent a rational and legitimate government interest, retaliatory

68

actions taken against a public employee related to seeking public office constitute an infringement on that employee's liberty interest as protected by the Fourteenth Amendment. *U.S.C.A.* Const. Amend. 14.

Restrictions on the right are constitutionally permissible where the government entity impairing the right shows that the restrictions on the ability to run for office are reasonably necessary to achieve a compelling need of the entity. *See Broadrick v. Oklahoma*, 413 *U.S.* 601, 93 *S. Ct.* 2908 (1973). Courts have adopted a "balancing approach" finding that the government may place limits on a public employee's right to run for elective office if the limits substantially serve government interests that are important enough to outweigh the employee's First Amendment rights. *Id.* Generally, the cases considering the right to seek public office involve challenges to state laws limiting a general category of persons' right to seek public office, and not individual cases of retaliation such as Mr. Hinton's. In other words, the majority of cases involve claims that the effect of generally applicable laws was to discriminate against certain classes of people in contravention of the Equal Protection Clause, and the First Amendment.

In contrast, plaintiff is not challenging a generally applicable statute, but asserting that unlawful action was taken against him personally, in the form of the denial or refusal to

consider his legitimate request for a leave of absence to seek public office.

Plaintiff had a substantial interest in the right to run for elective office. The fact that a right may not be considered fundamental does not mean that such a right is not deserving of any constitutional protection. *See Becton v. Thomas*, 48 *F. Supp. 2d* 747 (W.D. Tenn. 1999). In *Miller v. Lorain County Bd. of Elections*, 141 *F. 3d* 252 (6th Cir. 1998), *cert. denied*, 525 *U.S.* 923, 119 *S. Ct.* 278, 142 *L. Ed. 2d* 230 (1998), the Sixth Circuit explained: "It is difficult to define the contours of the right of candidacy. Given the integral relationship between the candidacy and voters' right under the First Amendment, candidacy may involve some level of protected property or liberty interest. *Id.*

Plaintiff's right to run for public office is also constitutionally protected as a liberty interest under the Fourteenth Amendment's Due Process Clause. In *Meyer v. Nebraska*, 262 *U.S.* 390, 43 *S. Ct.* 625, 67 *L. Ed.* 1042 (1923), the Court described the liberty guaranteed by the Fourteenth Amendment as encompassing: the right of an individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. *Meyer* at 399, 43 *S. Ct.* 625.

The freedom to run for political office is sufficiently similar to the freedoms listed in *Meyer* to qualify as a liberty interest protected by the Due Process Clause. "American history has demonstrated that a political career, no matter how short-lived is one of this country's 'common occupations of life." *Becton v. Thomas, supra,* at 758. Several federal courts have described the opportunity to run for office as a right or liberty entitled to some protection. *See Clements v. Fashing,* 457 *U.S.* 957, 971, 102 *S. Ct.* 2836, 73 *L. Ed. 2d* 508 (1982) (referring to "appellees' First Amendment interests in candidacy);" *Flinn v. Gordon*, 775 *F. 2d* 1551, 1554 (11th Cir. 1985) (referring to "a constitutional right to run for office"); *Mancuso v. Taft*, 476 *F. 2d* 187, 193 (1st Cir. 1973) (referring to "the right to become a candidate for public office"); *Reed v. Town of Babylon*, 914 *F. Supp.* 843, 892 (E.D.N.Y. 1996) (referring to the 'first amendment's protection of the freedom of association and of the rights to run for office"). Since the freedom or opportunity to run for political office is a liberty interest under the Fourteenth Amendment's Due Process Clause, a state cannot deny or infringe that liberty interest unless it can offer a reasonable justification or rational basis for doing so. Defendants have advanced no such justification or basis in the present case. Defendants have provided no rational or legitimate government interest that would cure this infringement upon Plaintiff's

Fourteenth Amendment liberty interest in running for political office.

Mr. Hinton could not simultaneously mount an effective campaign for elective office and fulfill his responsibilities as a police officer and reasonably requested this leave of absence. If any other police officer submitted such a request, it was granted. In fact, as previously noted, ironically in this election, Officer Townes was seeking to run against the sitting Mayor. He, too, was receiving no response to repeated requests for leave. Only after the intervention of counsel was he accommodated. (Exhibit 9). If defendants relented on Townes, why not Hinton (who was running on the same ticket as Townes)? Perhaps if Hinton had threatened litigation he would have received approval; however, is this what fairness dictates? Cleary's failure to release Hinton can be readily interpreted as just another part of a continuing pattern of harassment.

In plaintiff's case, however, not only was the request not granted, but it was ignored by the plaintiff's supervisor, Pyczko (Exhibit 10) and the Chief of Police, without any legitimate explanation whatsoever. Defendants have advanced no reasons for denying plaintiff this opportunity and have identified no government interests that are important enough to outweigh Mr. Hinton's interests.

Defendants argue that Mr. Hinton's reliance on *N.J.S.A. 11A:6-14* (Exhibit 2) is misplaced. This statute provides that

72

"[A]ny person holding a position in the career service of any political subdivision shall upon written request be granted a leave of absence, without pay, to fill any elective public office for the term of the office." Although the statute does not specifically address the employee's entitlement to a leave of absence to run for public office, it recognizes the importance of such public service by providing the opportunity for an employee to both retain the benefits of his public employment and also engage in public service by holding an elective office.

Defendants argue that it did not matter that plaintiff was denied the opportunity to seek office as a City Council member because he would not have been able to continue working as a police officer and hold this office by virtue of the "doctrine of incompatible offices." This argument is not relevant to plaintiff's right to a leave of absence to seek this office. Had plaintiff ultimately been successful in his run for office, he would have had the opportunity to make the appropriate decisions relating to his future with the Police Department. Further, the governing State Administrative Code, 11A:6-14, indicates in relevant part: "Upon the expiration of the term of office, that person shall be entitled to resume the position held at the time of the granting of the leave of absence, if the employee shall apply for reinstatement before the expiration of the leave of absence and return to duty within six years after the commencement of leave." (Exhibit 2).

However, plaintiff was unfairly and unlawfully denied even the courtesy of a timely reply to his request for leave in order to seek this office. There is no proof that the failure to grant plaintiff's request for leave was based on any legitimate need of the Department and plaintiff has established sufficient evidence that it was simply another act of retaliation against him.

### POINT X

### PLAINTIFF HAS PLEADED A VIABLE CAUSE OF ACTION UNDER THE LAW AGAINST DISCRIMINATION.

Defendants argue that plaintiff's allegations that their actions violated the New Jersey Law Against Discrimination (*N.J.S.A.* 10:5-1 et seq.) must be dismissed for failure to state a claim under the law and on the Statute of Limitations. Defendants acknowledge that the Act prohibits retaliatory action against a person who has opposed any practices or acts forbidden under the Act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of any right granted or protected by the Act.

With respect to plaintiff's claims that the failure to promote him to Lieutenant despite the fact that he was eligible and there were available positions in retaliation for his refusal to participate in the "pay to play" scheme, defendants argue that the promotion decision was made in October 2001 and the Law Against Discrimination was not filed until August 16, 2005,

74

therefore it is time-barred by the two-year Statute of Limitations for such claims.

The plaintiff's claim of alleged retaliation is not based, as defendants contend, simply on the non-promotion. The failure to promote is one aspect of plaintiff's claim. As defendants point out, the plaintiff was not promoted in October 2001, but he attempted to go through the appropriate channels to appeal that decision. A final decision was not issued on the promotion until February 17, 2004. (Ex. 1, p. 4 to East Orange defendants' brief). Until that final decision was issued, plaintiff had the potential to remedy the retaliatory action taken against him for failure to participate in the unlawful "pay to play" scheme through other avenues.

Plaintiff did not have all of the facts regarding the basis for the failure to promote at the time that the official decision was made. Plaintiff continued to pursue the real reasons for the decision as he went through the appeal process.

In addition, plaintiff's claim is not solely based on the decision not to promote him, but on the retaliatory action taken against him in the form of unfavorable job assignments. Plaintiff contends that these actions were taken against him both because of his refusal to participate in the "pay to play" scheme and because of his refusal to provide false information against Norman Price to assist in the criminal investigation against him.

Plaintiff was asked to provide testimony against Price in the spring of 2004, after Price was suspended from the Department as a result of his indictment. Plaintiff had no knowledge of any criminal activities and could not provide the type of information defendant Davis was seeking. Both Defendants Davis and Jest attempted to intimidate plaintiff with threats of criminal prosecution if he did not provide false information against Price.

Defendants argue that this aspect of plaintiff's LAD claim must fail because Hinton suffered no adverse job consequences as a result of their actions. The evidence, however, shows that this is not at all the case. Prior to this time, Keith Hinton had been employed as a police officer with the Department for almost 18 years. During this lengthy career, there were never any sudden changes made to his assignments and/or duties. After these events, however, his duties began to be altered dramatically, as detailed in the Statement of Facts. These changes took place after the Price indictment in 2004 and continued after this complaint was filed on October 1, 2004.

Plaintiff was transferred to the Day Shift, a change that cost him the opportunity to engage in his secondary employment and the loss of a substantial portion of his income. Plaintiff was subjected to harassment on a daily basis from his supervisors at the written direction of the Chief of Police. The harassment became so intolerable that plaintiff had no choice but to leave

his position with the police department. The constructive termination of his career with the East Orange Police Department was certainly an adverse employment action after almost 20 years of service.

## POINT XI

### PLAINTIFF HAS ESTABLISHED SUFFICIENT EVIDENCE TO CREATE AN ISSUE AS TO WHETHER HE IS ENTITLED TO PUNITIVE DAMAGES.

Defendants argue that plaintiff's claim for punitive damages must be dismissed as a matter of law because plaintiff has not sufficiently plead wanton and willful conduct on the part of the City of East Orange and the East Orange Police Department. Plaintiff has set forth in detail above his allegations of willful and wanton conduct on the part of these defendants in the manner in which they dealt with his employment as a police officer. The defendants are potentially liable, if the jury finds that they participated in willful indifference to the harassment or retaliation. The City of East Orange is liable for punitive damages in the event of actual participation by upper management, as existed in this case. The individual defendants are liable for punitive damages because they participated in the harassment and retaliation and they were willfully indifferent to the harassment and retaliation inflicted on plaintiff by others. *See Lehman v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, at 624-625 (1993).

## POINT XII

### DEFENDANTS' CONTENTION THAT THEY
### ARE ENTITLED TO ATTORNEY'S FEES
### IS MERITLESS AND SHOULD BE DENIED.

Defendants contend that they are entitled to attorney's fees in this action because plaintiff's complaint is frivolous. The factual and legal arguments above establish the good faith and reasonable basis of every claim asserted by Mr. Hinton in this case. This complaint is in no way frivolous and defendants' motion should be denied.

## RESPONSE TO DEFENDANT JEST'S MOTION

## POINT XIII

### THE "RULE OF THREE" DOES NOT GIVE
### DEFENDANTS' UNFETTERED DISCRETION
### IN MAKING PROMOTION DECISIONS.

Defendant Jest argues that he is entitled to a dismissal or to summary judgment as to the Third Count of the complaint which alleges that he and the other defendants conspired to violate plaintiff's civil rights pursuant to 42 *U.S.C.* Section 1983. Jest argues initially that plaintiff cannot assert a "right" to promotion that is protected by Section 1983. Jest contends that even if everything plaintiff is alleges, that he was not promoted because he refused to pay for the promotion, that is irrelevant because the City of East Orange promotes its officers by the "Rule

78

of Three." Jest contends that the "Rule of Three" method of promotion suggests that the individuals and/or entities who make the decision to promote can pick any one of the top three on the promotional list of candidates. (Jest Brief at pg. 6).

Defendant Jest contends that the "Rule of Three" vests a "great deal of discretion" in the promotional process and cites cases that purportedly hold that in jurisdictions that follow the "Rule of Three" there is no guaranteed right to a promotion. (Jest Brief at pg. 7). Defendant's reliance on these decisions does not end the analysis, however. Nowhere does it hold in any of the decisions cited by defendant that the Rule of Three gives an entity unfettered discretion or that promotion decisions can be made on an unlawful basis.

The New Jersey Constitution provides that appointments and promotions in the civil service of the state, and of such political subdivisions as may be provided by law, shall be made according to merit and fitness…. *N.J.S.A. Const.* 1947, Art. 7, Section 1, Paragraph 2.

In *In re Hruska,* 375 *N.J. Super.* 202 (App. Div. 2005), an inactive volunteer firefighter appealed from a final decision of the New Jersey Merit System Board which upheld the Borough of Carteret's refusal to appoint him, under the "rule of three" from two certified lists of eligible candidates for borough's paid fire department. The plaintiff alleged that Carteret refused to appoint him for discriminatory and retaliatory reasons.

Carteret has a combination Fire Department, consisting of two volunteer departments and one paid, or career, department. For fifteen years, plaintiff acquired his firefighting experience in Carteret by enrolling in the volunteer departments. Plaintiff subsequently took a civil service to become a paid firefighter. After completing the exam and required testing, plaintiff was advised that he ranked number on the certification list. *Id.* at 205. Plaintiff applied for positions as openings occurred, but was bypassed for promotion on three occasions. Plaintiff had become an "inactive member" of the volunteer fire department when he took the civil service exam and Carteret imposed a threshold requirement of active volunteer firefighting status which overrode any other consideration of suitability for appointment.

Carteret opposed the plaintiff's appeal on the basis that the promotion decisions were discretionary as Carteret followed the "rule of three" method of promotion. The Merit System Board explained that "under the Rule of Three, [an appointing authority like Carteret] may use *any legitimate basis* to bypass an individual in favor of lower-ranked eligibles." *Id.* at 206 (emphasis in original).

The Appellate Division found that there was sufficient credible evidence in the record to support plaintiff's contention that he was bypassed for promotion because Carteret had created a threshold, qualifying requirement for appointment, active volunteer status, that was not among the qualifying requirements

developed by the Department of Personnel. The evidence in support
of this contention was testimony by plaintiff that when he was
bypassed the first time, a councilman advised him that "the only
reason why you were passed up is because these two guys were
active and you weren't for the last years. That's the only
reason." *Id.* at 208.

The *Hruska* Court rejected the defendants' argument that the Rule
of Three permitted them to appoint any one of the top three
candidates who was considered best suited for the position. The
Court agreed that "…Carteret could bypass Hruska for any
legitimate reason based upon the candidate's merit….However, the
rule of three, while permitting a broad exercise of discretion,
also operates to 'narrow hiring discretion.' Its basic intent and
effect[]acts to fetter the absolute discretion of government to
hire.' '[T[he discretion of government to hire is not absolute,'
and 'other important criteria in governmental employment
practices' are still relevant. Discretion may not be 'exercised in
a way inconsistent with merit considerations.' All civil service
appointments must 'be made according to merit and fitness to be
ascertained, as far as practicable, by examination….'" *Hruska,
supra*, at 210 (citations omitted).

The *Hruska* Court noted, "…for example, the Law Against
Discrimination, *N.J.S.A.* 10:5-17, further limits the appointing
authority's discretion during hiring determinations despite the
rule of three. 'Significant limitations, founded on constitutional

and statutory principles, have always been an inherent concomitant of government's authority to employ.' '[T]here is nothing intrinsic in the 'rule of three,' either in a constitutional sense or as a matter of legislative contemplation, that renders it totally impervious to reasonable modifications or influences.'" *Hruska, supra,* at 210 (citations omitted).

The *Hruska* Court fond that the decision to bypass plaintiff for promotion were improperly made. "We merely conclude that there is a difference between comparing candidates on the list by carefully and in good faith evaluating their merit and fitness, as required by the Constitution and our civil service system, and excluding a candidate from any consideration or comparison with other candidates because of an unannounced, secret eligibility requirement." *Id.*

In this case, the rule of three does not serve to immunize any promotion decision made in this case, as defendant contends. It the failure to promote plaintiff was based on, as Mr. Hinton alleges, retaliatory action against him for his refusal to participate in the "pay for play" scheme and the selection of Harvey Rison for promotion over plaintiff not based on a good faith evaluation of the respective merits of the candidates for the position, plaintiff has established a cause of action.

Similarly, in *Regan v. City of New Brunswick*, 305 *N.J. Super.* 342 (App. Div. 1997) (abrogated on other grounds, *Dzwovar v. McDevitt*, 177 *N.J.* 451 (2003)), a police officer brought a CEPA

action alleging retaliation in his supervisor's decision not to
promote him. The trial court granted defendants' motion for
summary judgment. The Appellate Division reversed, holding that
the court erred in failing to consider whether animus by the
officer's supervisor related to the officer'' investigation of a
racial incident involving another employee persisted and was
evidence of retaliation which pervaded the supervisor's decision
not to promote the officer for purposes of CEPA. The Appellate
Division further held that the trial court improperly failed to
consider the officer's allegations regarding his belief that an
innocent defendant had been charged with crimes and that his
report to his superior officers with regard to his belief led to
retaliation by employer required remand.

    The plaintiff, Roger Regan, alleged that the New Brunswick
Police Department and the City of New Brunswick violated CEPA in
failing to promote him from the position of sergeant to the
position of lieutenant, like Keith Hinton in this case. Plaintiff
alleged that three separate investigations which he conducted in
1991 led to the retaliatory employment decision of July 1, 1993.
The defendants argued that their promotion decisions were made on
the rule of three method.

    Plaintiff alleged that the defendants' decision not to
promote him to lieutenant were pretextual and that he was not
promoted in retaliation for his conduct during the three separate
investigations prior to that date. *Id.* at 347. One of the

investigations at issue involved an alleged assault on one patrolman, James Neal, by another patrolman, Pablo Ortiz. Plaintiff concluded that Neal was not at fault for the altercation with Ortiz. Ortiz was then a member of Sergeant Carroll's unit of command. Plaintiff alleged that substantial animus developed between himself and Carroll arising from the plaintiff's investigatory conclusion. Plaintiff contended that the animus persisted and became a factor in one of the promotional decisions at issue. *Id.* at 348.

During a second investigation, plaintiff became aware that Sergeant Carroll had information relating to a key witness to be interviewed. Carroll refused to give the information to plaintiff. Plaintiff informed the Captain of Detectives that Carroll refused to release the information.

A third investigation also revealed improper conduct on the part of Sergeant Carroll which plaintiff reported to his superiors. It was plaintiff's understanding that Sergeant Carroll was demoted as a result of the final incident.

In support of his contention that his non-promotion was retaliatory, plaintiff referenced two confrontations with Sergeant Carroll during which Carroll referred to plaintiff as "a rat." *Id.* at 350. Plaintiff also testified that Carroll, while acting Deputy Director, told other police officers that plaintiff would never be promoted. *Id.* at 351.

84

The Court further noted that plaintiff had vocally objected to the arrest of an individual in one of the investigations, who he believed to be innocent of the charges. The Court found such a belief would properly form the basis of a CEPA claim if it were reasonable. *Id.* at 355. The *Regan* Court found that plaintiff's belief that illegal conduct was occurring had "…an objectively reasonable basis in fact—in other words that, given the circumstantial evidence, a reasonable lay person would conclude that illegal activity was going on." *Id.* at 356 (citations omitted). Based on the totality of the circumstances, the Court found that the trial court had erred in granting summary judgment in favor of the defendants.

Defendant Jest's argument that plaintiff has no claims against him with regard to the promotion issue because the Department follows the Rule of Three method for promotion does not in any way address the issues plaintiff has raised as to the legitimacy of this process and his motion to dismiss on this basis should be denied.

<u>POINT XIV</u>

**GENUINE ISSUES OF MATERIAL FACT
EXIST AS TO DEFENDANT JEST'S ROLE
<u>IN THE DENIAL OF PLAINTIFF'S PROMOTION.</u>**

Defendant Jest argues that plaintiff has not come forward with proof that any action on his part impacted on his Section 1983 rights. Jest contends that plaintiff has not established

conclusively who specifically is responsible for the purging of the Harvey Rison file.

Substantial issues of material fact exist on this important aspect of the case. What is known to plaintiff is that it is defendant Jest who reviewed Harvey Rison's personnel file at the relevant time. Defendant Jest either personally purged Rison's file of the disciplinary charges in order to assist in promoting Rison over plaintiff or has knowledge as to how the file came to be purged.

Defendant Jest was also present during the meeting where plaintiff was threatened with "criminal prosecution should he be deemed to associate, assist and/or support Norman Price." Jest admits that he was present during this meeting, but contends that he did not actually make the statements at issue so he cannot be found liable to plaintiff as a matter of law. A jury could reasonably find that Jest's participation in the meeting was in and of itself an attempt to intimidate and threaten plaintiff and it was not necessary for Jest personally to have made the threatening statements. As a police officer, does Jest really contend that it was reasonable for him to observe unlawful actions taking place directly in his presence and do absolutely nothing to stop it or to report to the proper authorities?

## POINT XV

### DEFENDANT JEST'S MOTION FOR
### SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM
### FOR INTENTIONAL INFLICTION OF EMOTIONAL
### DISTRESS SHOULD BE DENIED.

For the same reasons advanced by the East Orange defendants, Defendant Jest argues that plaintiff's claim for intentional infliction of emotional distress should be denied. Plaintiff's response to this argument is addressed in Point VIII above.

## POINT XVI

### DEFENDANT JEST'S MOTION TO DISMISS
### PLAINTIFF'S LAD CLAIM SHOULD BE DENIED.

Defendant Jest contends that plaintiff's LAD claim should be denied because plaintiff has alleged that it was Defendant Grimes who made the decision to transfer him and change his work duties in retaliation for engaging in protected activity, not defendant Jest. Genuine issues of material fact exist as to Jest's liability under the LAD. Plaintiff's retaliation claims are not limited solely to the decision to transfer him. That decision was but one part in a continuing pattern of harassment that began when plaintiff refused to pay for his promotion.

Defendant Jest was involved in the failure to promote plaintiff in his role in the review of Harvey Rison's purged personnel file. Defendant Jest further attempted to intimidate and threaten plaintiff with criminal prosecution because of his support for Norman Price by participating in the meeting where such action was discussed above. The facts supporting Jest's

87

involvement in these actions are set forth in detail above. In addition, plaintiff incorporates by reference the arguments relating to the LAD claim stated in opposition to the East Orange Defendants' motion.

**RESPONSE TO DEFENDANT LIEUTENANT MICHAEL PYCZKO'S MOTION**

**RESPONSE TO PYZCKO'S RULE 56.1 STATEMENT**

1.  The statement in paragraph 1 is not addressed to plaintiff and no response is made to same.

2.  Plaintiff disputes the statement in paragraph 2. Plaintiff states that there are substantial material facts in existence which preclude summary judgment in this action. Plaintiff does not dispute that defendant Pyczko joins in the motions of the co-defendants.

3.  To the best of plaintiff's knowledge, the facts set forth in paragraph 3 are undisputed. Plaintiff is not fully aware of the details of defendant Pyczko's service with the Police Department.

4.  Plaintiff disputes the statements in paragraph 4. Plaintiff does not dispute that he became a police officer with the East Orange Police Department on or about February 2, 1986 and was promoted to the rank of Sergeant in 1995. Plaintiff disputes, however, that he separated his employment with the Department. Plaintiff contends that he was constructively terminated from this position due to the retaliatory and harassing conduct of the defendants. (T. Hinton).

5.   Plaintiff states that the allegations of his complaint against the defendants speak for themselves.

6.   Plaintiff does not dispute the statement in paragraph 6.

7.   Plaintiff states that the allegations set forth in the Third Amended Complaint against defendant Pyczko speak for themselves.

8.   Plaintiff states that the responses made in his answers to interrogatories speak for themselves.

9.   Plaintiff disputes the statements in paragraph 9. Plaintiff claims that defendant Pyczko harassed him in the performance of his duties as a police officer to the extent that the position became intolerable. Plaintiff cited as an example of this harassment the excessive number of "to/froms" initiated by defendant Pyczko. Plaintiff does not contend that this was the extent of the harassment. Plaintiff disputes that the "to/froms" were properly requested by defendant Pyczko. (T. Hinton. Exhibit 8).

10.  The statements in paragraph 10 are somewhat difficult to understand. To the extent the paragraph 10 states that defendant Pyczko's deposition was taken in this litigation, plaintiff does not dispute that statement. Plaintiff does not dispute that defendant Pyczko submitted a certification stating that he never treated any persons under his supervision unfairly including Plaintiff and that he has always acted in good faith as an East Orange Police Officer.

Plaintiff does, however, dispute the veracity of the contents of defendant Pyczko's certification. Plaintiff contends that defendant Pyczko did not act in good faith or treat him fairly during the time he was plaintiff's supervisor. (T. Hinton).

11. Plaintiff disputes the statements in paragraph 11. Plaintiff states that he has offered proof in support of his claims against him pursuant to 42 *U.S.C.* Section 1983, the First of Fourteenth Amendment or any aspects of the New Jersey Constitution. (See Legal Argument above and in opposition to Pyczko motion).

12. Plaintiff disputes the statement in paragraph 12. Plaintiff states that there are numerous genuine issues of material fact precluding summary judgment in favor of defendant Pyczko. (See Statement of Facts and Legal Argument above and in opposition to Pyczko motion).

## POINT XVII

### DEFENDANT PYCZKO DOES NOT HAVE QUALIFIED IMMUNITY FROM LIABILITY.

Defendant Pyczko denies that as plaintiff's supervisor, he participated in the efforts of the defendants to make plaintiff's working environment so hostile, so intolerable, that he would have no alternative but to leave the Police Department. The facts of this matter are such that a jury could reasonably conclude to the contrary.

As set forth in detail above, plaintiff's difficulties with the Department began in 2001, when he was asked to "pay" for a promotion to the rank of Lieutenant after he was appointed to the eligibles list. Plaintiff refused to participate in this process and the defendants began their campaign to retaliate against him.

Mr. Hinton's relationship with his superiors in the Department further deteriorated when he spoke up in support of a police officer, Norman Price, who he reasonably believed was wrongfully targeted for criminal prosecution by the defendants. Mr. Hinton believed that Mr. Price, as any other officer or citizen, was entitled to be treated fairly and given the presumption of innocence in the criminal investigation and prosecution.

Defendants, on the other hand, were out to get Price "at all costs." Pressure was put on plaintiff and others known to be supporters of Price to fabricate false testimony against him. Plaintiff was threatened with criminal prosecution himself if he continued to support Price at this time.

After this point, defendants intensified their efforts to "get" Hinton and force him out of the Department. Prior to this time, plaintiff had worked for the Department for 18 years and had no sudden or unusual changes to his assignments. After this time, however, plaintiff's duties began to change dramatically. Mr. Hinton was transferred to the Dispatch Room on the Day Shift. This

91

transfer resulted in his inability to continue his secondary
employment and a loss of a substantial portion of his income.

After his transfer to the Dispatch Room, plaintiff was given
no training from his supervisors as to perform his duties.
Lieutenant Pyczko was qualified to handle all of the required
duties necessary to run the dispatch room, but provided no
training whatsoever to plaintiff. Pyczko never even made sure that
plaintiff was trained in the use of the 911 system, an essential
requirement for Dispatch Room managers.

It is undisputed that defendant Charles Grimes, who was Chief
of Police at the time, issued a written directive based on an
anonymous "tip" requiring plaintiff's day-to-day activities to be
scrutinized constantly. Plaintiff's initial supervisor,
Antonovich, confirmed receipt of the Chief's directive. After
Antonovich's retirement, Lieutenant Pyczko became plaintiff's
supervisor. The harassment greatly intensified from that point.

Exhibit 4 to defendant Pyczko's memorandum of law in support
of his motion to dismiss the complaint shows the level of
harassment. For example, a "to/from" to Sgt. Hinton from Lt.
Pyczko asks Hinton to submit a report as to why he did not
complete certain reports left for him that day. The tone of the
memo is extremely confrontational and hostile. Hinton's response
to the memo shows that there was no good faith basis for Pyczko's
communication. Hinton replies that the reports were not even
properly directed to his attention, but intentionally left at

92

another location where Hinton would be unlikely to find them. Hinton also points out that it was Pyczko himself who had scheduled him for training on the day the reports were purportedly due.

Another memo from Lt. Pyczko to Sgt. Hinton, dated June 16, 2005 contains similar confrontational language. Pyczko's memorandum demands: "Were downstairs were you with a citizen? (sic) What citizen? Submit the report by June 17, 2005." (See also Hinton Certification, Exhibit 2).

A "to/from" exchange between Pyczko initiated by Pyczko's June 14, 2005 memorandum is Exhibit 9. Pyczko demands in that memo: "On June 3, 2005 you were not in communication to the end of your tour. Who authorized your time? What time did you leave communication? Submit a report by June 16, 2005, 0700 hour." Plaintiff responded the following day: "The undersigned did not leave HQ on 6-3-05 until 0700 hrs. The undersigned was downstairs talking to a citizen. The undersigned did not note what exact time I stepped out of communications. The undersigned notified all personnel that I would be out of the room."

Keith Hinton's certification (Exhibit 5) provides further detail for the manner in which he was harassed on-the-job by Lt. Pyczko.

Defendant Pyczko argues that his actions in requesting reports was standard operating procedure and his actions were at all times objectively reasonable under federal law. Plaintiff

93

disputes Pyczko's statements. It was only Keith Hinton who was treated in this abusive manner by Pyczko. No other officer was subjected to this level of scrutiny or harassed in this way.

Based on the factual and legal arguments set forth above, plaintiff contends that he has submitted sufficient evidence to establish genuine issues of material fact as to whether the actions taken by the defendants were in retaliation for his exercise of his constitutional rights, pursuant to 42 *U.S.C.* Section 1983.

Defendant Pyczko contends that even if this is the case, he is immune from liability pursuant to the doctrine of qualified immunity.

A public official performing a discretionary function enjoys qualified immunity in a civil action, provided his or her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 *U.S.* 800, 818 (1982).

When a qualified immunity defense is raised a court first should determine whether the plaintiff has asserted a violation of a constitutional right at all. *Larsen v. Senate of the Commonwealth of Pennsylvania,* 154 *F. 3d* 82, 86 (3d Cir. 1998).

A right is "clearly established" for qualified immunity purposes only if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. Only if reasonable officials in their

94

position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful can a qualified immunity defense be claimed. *Larsen,* at 87 (citations omitted).

Defendant is not immune, if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that his actions were lawful. *Id.*

The plaintiff in this case has established evidence of a constitutional violation, defendants' pattern of retaliation and harassment against him for his assertion of his lawful rights. The issue, then, is whether genuine issues of material fact exist as to whether defendant Pyczko is entitled to qualified immunity.

A jury could reasonably find that Lt. Pyczko was a willing and voluntary participant in the defendants' efforts to "get" Keith Hinton and force him out of the Police Department ultimately. The retaliatory and harassing actions against Keith Hinton did not begin until after he asserted his rights. No officer other than Keith Hinton was treated by Lt. Pyczko in the abusive manner plaintiff was.

A reasonable person in Lt. Pyczko's position could not have considered it appropriate, as a matter of law, to harass an officer under his supervision on a daily basis for the purpose of creating such a hostile working environment that the officer would have no choice but to leave the position.

The tone and content of the excessive number of "to/froms" and the Certification of Keith Hinton establish a genuine issue of material fact as to whether Lt. Pyczko participated in this harassment and defendant is not entitled to qualified immunity in the circumstances of this case.

## CONCLUSION

For the foregoing reasons, plaintiff respects that defendants' motions be denied.

By:    *S/ROBERT B. WOODRUFF, (RW0245)*
        ALGEIER WOODRUFF, P.C.
        60 Washington Street
        Morristown, New Jersey  07960
        (973) 539-2600
        Fax #:  (973) 984-0430
        (robertwoodruff@atwlaw.com)
        Attorneys for Plaintiff

Dated:  February 9, 2007